UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

BARRETT C. SWAN,                    )
                                    )
            Petitioner,             )
                                    )
    v.                              )    Case No. 1:21-CV-00142-SNLJ
                                    )
UNITED STATES OF AMERICA,           )
                                    )
            Respondent.             )

**MEMORANDUM AND ORDER**

On September 27, 2021, Petitioner Barrett Swan ("Swan") filed this Motion to Vacate, Set Aside or Correct Sentence pursuant to Title 28, United States Code, Section 2255. This Court then ordered the United States to show cause why the relief requested in Swan's motion should not be granted. Based on the reasons set forth below, this Court will dismiss Swan's claims as waived and procedurally barred or otherwise deny them without an evidentiary hearing because they fail as a matter of law.

## I.    **PROCEDURAL HISTORY**

On July 10, 2018, a federal grand jury returned an Indictment charging Swan with being a felon in possession of a firearm in violation of Title 18, United States Code, Section 922(g)(l). *United States v. Swan*, 1:18-cr-00098-SNLJ, Doc. 2[1].   On September 11, 2018, Swan was charged by a Superseding Indictment with the same offense. Doc. 22. On June 27, 2019, a Second Superseding Indictment was returned charging Swan with two counts

---

[1] All remaining citations refer to the criminal case, 1:18-cr-00098-SNLJ, unless otherwise indicated.

of being a felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1). Doc. 65. Count I of the Second Superseding Indictment arose out of Swan's possession of a firearm in Cape Girardeau County, Missouri, on or about May 26, 2018. Count II arose out of a separate incident in which Swan possessed a different firearm in St. Louis County, Missouri, on or about August 1, 2018. Attorney Jennifer Booth was appointed to represent Swan and represented him for the entirety of the criminal case.

### A. Motion to Suppress

On November 21, 2018, Swan filed a motion to suppress certain statements that he made to Florissant Police Officer Jonathan Kemp following his arrest on August 1, 2018. Doc. 35. After transporting Swan to the Florissant Police Department, and as Officer Kemp completed paperwork related to the arrest, Officer Kemp stated to Swan that he would have an opportunity to go to the interview room and speak about the firearm. Swan replied with words to the effect of, "I'm not going to talk. We both know what you found in the car. I'd rather be in the situation I'm in now than be in the situation I was in the past when I was shot without anything on me." Doc. 39.

In his motion to suppress, Swan argued that these statements were obtained in violation of his Fifth Amendment right against self-incrimination because he was not advised of his Miranda rights before he made them. Doc. 35 at 2–3. The United States filed a response on December 3, 2018. Doc. 39. The United States argued that, though Swan was in custody at the time of his statements and no Miranda warnings were given prior to his statements, the statements were spontaneous and not in response to any interrogation by Officer Kemp. *Id*. at 4–6.

B. **Evidentiary Hearing**

An evidentiary hearing for Swan's motion to suppress was held before United States Magistrate Judge Abbie Crites-Leoni on January 11, 2019. At the hearing, the United States presented the testimony of Officer Kemp. Evidentiary Hearing Transcript ("EH Tr.") 5–28. Swan called the case agent, Bureau of Alcohol, Tobacco, and Firearms ("ATF") Task Force Officer Brian Eggers, as a witness. EH Tr. 30–41. In its motion response, the United States conceded that Swan was in custody at the time of his statements and that Miranda warnings were not read beforehand. Doc. 39 at 4. The only issue before the Court, then, was whether Officer Kemp's statement that Swan would have an opportunity to speak about the firearm amounted to interrogation or words or actions "reasonably likely to elicit an incriminating response from the suspect." *Id.*

Officer Kemp testified that, on August 1, 2018, at approximately 3:20 a.m., he initiated a traffic stop of a vehicle in which Swan was riding after observing the vehicle fail to stop at a stop sign. EH Tr. 6–7.4 Officer Kemp requested identification from the driver, Tiara Thorpe, and the passenger, Swan. EH Tr. 7–8. Swan indicated that he did not have any identification and provided a false name and social security number. EH Tr. 8. After checking the information, Officer Kemp learned that Swan had provided false identifiers. EH Tr. 9. Officer Kemp returned to the vehicle and again asked for Swan's identification. EH Tr. 10. This time, Swan provided his own name and social security number. EH Tr. 10. With this information, Officer Kemp learned that Swan had an active federal arrest warrant. EH Tr. 11. Officer Kemp again returned to the vehicle, asked Swan to exit the vehicle, and placed Swan under arrest. EH Tr. 11. As Swan was exiting the

vehicle, Officer Kemp observed a firearm lying in the passenger seat where Swan had been sitting. EH Tr. 11–12.

Officer Kemp then transported Swan to the Florissant Police Department for processing. Officer Kemp escorted Swan to the "holdover," which he described as the room "where we hold persons before they get either transferred to a county or to a different police department for arrest warrants." EH Tr. 13. Officer Kemp testified that, while in the holdover, he completed paperwork on the traffic stop and arrest, inventoried Swan's property, and provided Swan a change of clothes. EH Tr. 13–14. As he was completing these tasks, Officer Kemp spoke briefly to Swan:

> A:    I told him that upon completion of the booking process, that he would be escorted to an Interview Room and given the opportunity to talk about the firearm.
>
> Q:    And how did Mr. Swan respond?
>
> A:    He stated the effect of, "I'm not going to talk; we both know what you found in the car, and I'd rather be in the situation I'm in now that the situation that I was in in the past when I was shot and didn't have anything on me."
>
> . . .
>
> Q:    Now prior to Mr. Swan making the statement, did you ask any question of Mr. Swan – of Mr. Swan that would require that answer?
>
> A:    No, sir.
>
> Q:    Did he – Did he make the statement all as one statement?
>
> A:    Yes, sir.
>
> Q:    Okay. That is, there wasn't an intervening question on your part?
>
> A:    No, sir.

> Q:      Did you continue to speak with Mr. Swan?
>
> A:      No. He indicated that he did not want to speak.
>
> Q:      So basically that was the end of your contact with him?
>
> A:      Correct, sir.

EH Tr. 14–15.

Defense counsel then cross-examined Officer Kemp. Counsel questioned Officer Kemp about the circumstances of Swan's statements, including the lack of Miranda warnings. EH Tr. 16, 19–20. Counsel also impeached Officer Kemp about his memory and lack of documentation for these statements:

> Q:      . . . [T]hat statement that you've relayed to us isn't a verbatim statement, correct? It's just what you remember the gist of what the statement was?
>
> A:      The first part is what I one hundred percent recall. As far as towards like the very end when it was referenced to being the situation "now that I was – when I was in previously and didn't have anything on me," that part I do not recall specifically. . . .
>
> . . .
>
> Q:      Okay. But then as truth be told, the second part you can't tell us verbatim the words but simply just the gist.
>
> A:      Correct.
>
> Q:      Okay. And it's fair to say that these statements that Mr. Swan made weren't memorialized by an audio recording or anything like that.
>
> A:      Correct.
>
> Q:      And when he made these statements, you didn't write them down immediately, correct?

A:      Correct.

Q:      So we are just going on your memory.

A:      Correct.

EH Tr. 16–17. Counsel went on to impeach Officer Kemp about other inaccuracies and details missing from his report, namely the date of the incident, which was incorrectly recorded in the report, EH Tr. 18, and that Thorpe told Officer Kemp at the scene that the firearm was hers, a fact missing from his report, EH Tr. 21.

Swan then called Officer Eggers to testify. Officer Eggers did not participate in the arrest of Swan on August 1, 2018 but had documented in his report the statements that Swan sought to suppress. In his report, Officer Eggers indicated that Officer Kemp "attempted to conduct an interview of Swan." EH Tr. 38. Defense counsel questioned Officer Eggers about what Officer Kemp had communicated about Swan's statements and when Officer Kemp informed him of the statements. EH Tr. 39–40. Counsel also questioned Officer Eggers about Thorpe's ownership of the gun, including whether an eTrace was ever done, and the fact that Officer Kemp never told him about Thorpe's statement to that effect. EH Tr. 40.

The parties both filed post-hearing briefing on Swan's motion to suppress. Docs. 54 and 55. In the defense's briefing, counsel highlighted for the Court inconsistencies between Officer Kemp's and Officer Egger's testimony, Doc. 54 at 2–4, and challenged Officer Kemp's credibility based on these inconsistencies, mistakes in his report, and information missing from his report, *Id*. at 5.

### C. **Order Denying Motion to Suppress**

On April 15, 2019, Judge Crites-Leoni issued an 11-page report and recommendation recommending that Swan's motion to suppress be denied. Doc. 56 ("R&R"). Judge Crites-Leoni concluded that Officer Kemp did not interrogate Swan, as he "did not directly question Swan regarding the firearm." *Id*. at 6. Judge Crites-Leoni further found that "Officer Kemp's explanation about there being an opportunity for Swan to participate in an interview after the booking process was completed was not designed to elicit an incriminating response." *Id*. at 7. In support, Judge Crites-Leoni cited a similar decision by the Eighth Circuit in *United States v. Head*, in which the Court found that an officer's statement that he wanted "to talk to [suspect] about what had occurred that morning" was not designed to elicit an incriminating response. *Id*. (citing 407 F.3d 925, 929 (8th Cir. 2005)). Finally, Judge Crites-Leoni addressed defense counsel's challenges to Officer Kemp's credibility:

> Swan argues that his statements were made during an attempted interview. . . . Swan's view that Officer Kemp attempted to interview him is based primarily on one sentence from TFO Eggers' written report and Eggers' testimony. TFO Egger's report stated that "Kemp later attempted to conduct an interview of SWAN." The record of this case does not support Eggers' characterization that Kemp attempted to interview Swan. TFO Eggers was not present during the booking procedure; his report reflects a second hand assessment of Kemp's oral summary of the circumstances under which Swan made the statement. The undersigned finds Officer Kemp's testimony to be credible.

*Id*. at 6–7. For these reasons, Judge Crites-Leoni concluded that Swan's statements were spontaneous and recommended that his motion to suppress be denied. Id. at 8.

On May 10, 2019, this Court issued an order sustaining, adopting, and incorporating therein the R&R. Doc. 59.

7

### D. **Trial**

#### 1. **Motion in Limine**

On July 1, 2019, the United States filed a motion in limine seeking to exclude evidence of a criminal case against a prosecution witness that was pending at the time of Swan's trial. Doc. 70. The motion stated that "[t]he government has advised counsel for defendant that Jonathan Kemp, a police officer with the Florissant, Missouri Police Department, whom the government intends to call as a witness at the trial in the above case, was charged with speeding and driving while intoxicated (DWI) in St. Charles County, Missouri Municipal Court" and that those charges were "pending at the present time." *Id*. at 1. In its motion, the United States argued that "the potential impeachment value of this information is scant, and is greatly outweighed by its prejudicial effect." *Id*. at 2. Specifically, the United States argued that the pending charges did not bias Officer Kemp or provide any motive or opportunity to give false testimony in exchange for a favorable resolution because the government "has no intention to intervene on his behalf with the state and local officials who are handling those charges." *Id*.

On the first morning of trial, the Court held a pretrial conference and took up the motion in limine:

> The Court:    Okay. So the next thing is the Government's motion in limine for determination of admissibility of impeaching information. I'll allow you to address that, but I think that the motion is well taken. Do you intend to try to impeach on the DWI offense or whatever it was?
>
> Ms. Booth:    No, Your Honor.
>
> The Court:    So there's no objection then to that motion in limine?

Ms. Booth:    Correct.

Trial Transcript ("Tr.") 7. The Court then granted the motion. Tr. 7.

### 2. Count I: Evidence of Swan's Knowing Possession of Firearm on May 26, 2018

The jury trial commenced on July 8, 2019, and lasted two days. The United States presented its case on the first day of trial and rested. Over the course of its presentation, the United States called approximately eight witnesses (as well as one additional witness on rebuttal) and presented evidence establishing that Swan knowingly possessed two firearms on two separate occasions.

First, the evidence established that Swan knowingly possessed a firearm in his vehicle on May 26, 2018, as alleged in Count I, as he led police on a high-speed chase in Cape Girardeau. The United States called four Cape Girardeau Police Officers: Officer Kyle Evans, Officer Rodney Edwards, Officer Gabriel Yoder, and Officer Brett Hellmann. On the early morning of May 26, 2018, Officer Evans observed a dark-colored Dodge Charger speeding as it crossed over a bridge from Illinois into Missouri. Tr. 110–12. When Officer Evans attempted to curb the vehicle, the Charger refused to yield, and Officer Evans radioed for assistance. Tr. 117–19. The Charger continued speeding through residential streets and eventually collided with a parked vehicle, at which point the driver fled from the Charger. Tr. 116–19, 142–46. Officer Evans pursued the driver on foot. Tr. 120–22. Officer Evans testified that he was familiar with Swan and recognized him during the pursuit. Tr. 119–20. He commanded Swan to stop by calling "Barrett," but Swan kept running. Tr. 120–21. Eventually, Officer Edwards located Swan hiding in some brush

alongside a residence and arrested him. Tr. 146–50.

Inside the Charger, officers found a firearm. When Swan fled out of the Charger, he left the driver's side door open. Tr. 122. Upon arriving at the scene, Officer Yoder observed a handgun in the pocket of the driver's side door. Tr. 158–60; 179. The gun was positioned such that it was easily accessible on the left side of the driver. Tr. 160–61. The firearm was loaded, with a round in the chamber. Tr. 161–62; 185–86. In addition, the evidence showed that vehicle belonged to Swan. The vehicle was registered to Swan. Tr. 195. Officer Evans was familiar with the vehicle and knew that it belonged to Swan. Tr. 115–16. Swan was the only person in the vehicle. Tr. 122. Officers found bank cards in the name of Barrett Swan during a search of the vehicle. Tr. 181. Finally, the evidence demonstrated that the firearm was not registered to Swan, Tr. 128, and that the firearm had been stolen from its lawful owner, Tr. 209–11.

### 3. Count II: Evidence of Swan's Knowing Possession of Firearm on August 1, 2018

The United States then presented evidence demonstrating that Swan knowingly possessed another firearm on August 1, 2018, in Florissant, Missouri, as alleged in Count II of the Second Superseding Indictment . Officer Kemp and Officer Eggers, as well as Florissant Police Officer Kevin Fodde on rebuttal, testified for the United States. Officer Kemp testified to the same circumstances of Swan's arrest on August 1, 2018, as he testified during the evidentiary hearing on Swan's motion to suppress. Officer Kemp testified that on the early morning of August 1, 2018, he pulled over a red Ford Edge in which Swan was the passenger. Tr. 223–25. During the traffic stop, Swan lied to Officer

Kemp about his name and identified himself only after Officer Kemp confronted him about his lie. Tr. 226–28. Officer Kemp learned that Swan had an active federal arrest warrant and radioed for a backup officer, Officer Fodde, who responded to the scene. Tr. 229, 238, 449–50. Officer Kemp then returned to the vehicle and placed Swan under arrest. Tr. 239–40, 451.

As Swan exited the vehicle, Officer Kemp "observed a firearm or handgun sitting on the passenger seat where Mr. Swan's previously sitting." Tr. 239–40. Officer Kemp testified that the gun was positioned on the left side of the front passenger seat and against the seat belt holder. Tr. 240–41. Officer Kemp and Officer Fodde then took custody of the gun, unloaded it, and placed Swan in Officer Kemp's police vehicle. Tr. 242–44, 246–47, 452. While still at the scene, Officer Kemp allowed Swan, at his request, to say goodbye to Thorpe. Tr. 246. Officer Kemp overheard Swan tell Thorpe something to the effect of "I'm finished, I'm done." Tr. 247.

Officer Kemp then transported Swan to the Florissant Police Department. Tr. 248. At the police station, Officer Kemp escorted Swan to a holdover room, where Officer Kemp inventoried Swan's property and provided Swan with a change of clothes. Tr. 249. While in the holdover room, Officer Kemp told Swan that he "would escort [Swan] up to an interview room so that we could discuss . . . the firearm that was located inside the vehicle." Tr. 250. In response, Swan told Officer Kemp:

> We both know what you found in the vehicle, and I'd rather be in a position that I'm in now than one that I was in in the past when I was shot and didn't have anything on me.

Tr. 250, 280. The evidence showed that Swan had suffered a gunshot injury in the

past. Tr. 280–81. The United States also introduced police dispatch logs and audio recordings that were consistent with Officer Kemp's testimony regarding the traffic stop and Swan's arrest. Tr. 216–21.

### 4. Cross Examination of Officer Kemp

On cross examination, defense counsel impeached Officer Kemp's recollection of Swan's arrest and statements. Counsel questioned Officer Kemp on how there were no photographs of where the gun was found in the vehicle and the fact that Officer Kemp could have had an evidence technician come to the traffic stop to document where the gun was found. Tr. 259–60. Counsel questioned Officer Kemp about Swan's statements at the Florissant Police Department:

> Q:     And, again, you don't really remember the statement verbatim; is that fair to say?
>
> A:     At this time, correct, yes, I do not recall specifically right now.
>
> Q:     And that statement he made to you isn't recorded in any way; correct?
>
> A:     Correct.
>
> Q:     There's no body cam video of him making that statement?
>
> A:     No.
>
> Q:     And as far as booking videos from the police department, there's no audio to hear what anyone has to say when being booked in; correct?
>
> A:     Correct.

Tr. 266–67. Counsel also highlighted how Thorpe and Swan were cooperative during the traffic stop, Tr. 254–58, and the fact that Thorpe and Swan were left alone in the vehicle

during portions of the traffic stop, Tr. 255–57, suggesting that Swan would have had the

opportunity to move the gun had he known it was there.

Defense counsel then impeached Officer Kemp on ownership of the firearm found

in Swan's possession, specifically that it was owned by Thorpe:

> Q:    Now, you testified here today that, in fact, Tiara Thorpe told you at
>        the scene that the gun was hers; correct?
>
> A:    Correct.
>
> Q:    And that's not reflected in your police report; correct?
>
> A:    Correct.
>
> Q:    And you never told Agent Eggers that information when you spoke
>        to him on the phone; correct?
>
> A:    Correct.

Tr. 261. Counsel also had Officer Kemp acknowledge that ownership of the gun was an

"important fact." Tr. 262. In addition, counsel questioned Officer Kemp about an ATF

eTrace report performed for the firearm:

> Q:    And thereafter – soon thereafter Detective Cork in your police
>        department did an ATF trace on the firearm; correct?
>
> A:    Yes. I believe that's their procedure, yes, ma'am.
>
> Q:    And an ATF trace is where the ATF is asked to find out who is the
>        initial purchaser of this firearm; correct?
>
> A:    Correct.
>
> . . .
>
> Q:    Who was the purchaser of the firearm according to the ATF trace
>        report?

> A:    Tiara Davon Thorpe.
>
> Q:    And that's the Ms. Thorpe that was in the car with Mr. Swan; correct?
>
> A:    Correct.

Tr. 262–64.

Finally, defense counsel impeached Officer Kemp's credibility by questioning him about a number of discrepancies and facts missing from his police report of Swan's arrest: Thorpe's statements to Officer Kemp that the firearm was hers, Tr. 261–62, 265; Swan's incriminating statements, Tr. 266; that there was a window of time during the traffic stop when Swan was left unattended in the vehicle, Tr. 267; that Swan gave a false name and identifiers to Officer Kemp, Tr. 268–69; and the date of Swan's arrest, Tr. 268–69. As to the date of arrest, counsel questioned Officer Kemp as follows:

> Q:    And the actual date of your encounter with Mr. Swan, of course is August 1st of 2018; correct?
>
> A:    Correct.
>
> Q:    But your police narrative indicates that the event happened on Wednesday, August the 8th of 2018; correct?
>
> A:    That's correct.
>
> Q:    Why is that date wrong?
>
> A:    It's just a clerical error on my part. I typed in 8, and it should have been the 1st.
>
> Q:    So it's your testimony when you sat down to write your report on August the 1st of 2018, you accidentally thought it was Wednesday, August the 8th instead?
>
> A:    Correct.

Q:      You got the date of August 1 correct on all the booking sheets; is that right?

A:      Correct.

Q:      You got the date of August 1st correct when you hand signed the St. Louis County Police Department evidence sheet?

A:      Correct.

Q:      And all those sheets were signed on August the 1st?

A:      Correct.

Q:      So when it came time to write the narrative, you got the date of the correct Wednesday of Mr. Swan's arrest wrong?

A:      Yes, ma'am.

Q:      And you read your police narrative after you completed it?

A:      Yes.

Q:      And you didn't catch this error when you proofread your narrative?

A:      I did not.

Tr. 269–70.

**5. Dismissal of Juror**

Following the direction examination of Officer Hellmann, the Court took a recess.

During the recess, the parties had the following discussion with the Court:

Ms. Booth:   Sir, it has come to the attention of the attorneys that one and, perhaps, more of the jurors are having difficulties staying awake. I have discussed this matter with Mr. Swan. He knows that he could ask for a mistrial at this point, and he is not going to do so. It's his understanding that we're going to finish the Government's case in chief today and return tomorrow for the defense case in chief, and he is not asking for a mistrial.

| The Court: | Do you agree with that, Mr. Swan? |
|---|---|
| Defendant: | Yes, sir. |
| The Court: | Okay. Do you have any questions about it? |
| Defendant: | No, sir. |

Tr. 207. The Court then made the following record:

> Okay. I will state that I did notice some people nodding off, but I didn't think anybody was asleep or anything like that. It's not much different than a lot of trials. I didn't really think that it was of that significance, but, anyway, you made your record, so you can bring the jury in. And I will admonish the jury to pay better attention.

Tr. 207–08. Once the jurors returned to the courtroom, the Court admonished the jurors: "The lawyers for both sides are very concerned that several of you appear to be nodding off a little bit. Please pay strict attention to everything that's going on during the trial." Tr. 208.

During the direct examination of Officer Kemp, the Court addressed Juror No. 7 and asked if he was "having trouble staying awake?" Tr. 236. Juror No. 7 responded that he was and that he had not taken his medicine. Tr. 236. At that point, the Court held a short recess to allow Juror No. 7 to take his medicine. Tr. 236. During the recess, and out of the presence of the jury, the Court made the following record:

> The juror in question who was falling asleep has said that he was having trouble staying awake. He's also one of the jurors who was the subject of our questions beforehand, so this is twice now. If we continue to have a problem with him, it's my intention to excuse him and substitute the alternate for him. So hopefully we won't come to that.

Tr. 237.

At the end of the first day of trial, the Court again addressed Juror No. 7, this time

outside of the presence of the remaining jurors, about concerns with contact between Juror No. 7 and persons in the gallery. Tr. 289. Court security officers had observed Juror No. 7 leave and go out to his car with two people who had been sitting with members of Swan's family and friends during trial. Tr. 289. Juror No. 7 told the Court that they were his family and that his family had driven him to the courthouse for jury service and stayed for the trial. Tr. 289–90. The Court then recessed, after which the Court learned from court security officers that the two people in question had informed the officers that they were with Swan's family. Tr. 291. The Court informed the parties that it intended to ask Juror No. 7 about this discrepancy on the next morning before trial resumed. Tr. 291. In response, defense counsel expressed concern about the Court inquiring further from Juror No. 7. Tr. 291–92. The Court asked, "[D]o you want to move for a mistrial?" Tr. 292. Counsel responded, "No." Tr. 292.

The following morning, the Court excused Juror No. 7 and substituted him with an alternate after learning that Juror No. 7 had been arrested for an outstanding warrant the night before. Tr. 298. The Court asked whether Swan had any objections. Counsel responded, "No, sir." Tr. 299.

### 5. Defense Case

On the second day of trial, the defense presented its case and called four witnesses: Ebony Stigall, Shavion Reed, Tiara Thorpe, and Swan. Ebony Stigall, Swan's former girlfriend, and Shavion Reed, his then-girlfriend, testified regarding Swan's possession of a firearm on May 26, 2018. Ebony Stigall testified that the firearm in the Dodge Charger was hers and that she had been driving the Charger earlier the night before Swan's arrest.

Tr. 308–15, 319–22. Shavion Reed testified that she had also been with Swan the night before he was arrested and that he had been driving another vehicle before Stigall left him the Charger to drive home. Tr. 334–38, 340. Regarding Swan's arrest on August 1, 2018, Thorpe testified that the firearm found in Swan's possession belonged to her. Tr. 348–51. Thorpe also disputed Officer Kemp's testimony that the gun was found on the front passenger seat where Swan had been sitting. Instead, Thorpe testified that the gun was kept in the center console of the vehicle. Tr. 353–57.

Lastly, Swan testified in his own defense. During his testimony, Swan denied knowingly possessing the firearm found in the Dodge Charger following his arrest on May 26, 2018, Tr. 394, 398–99, 404, or knowingly possessing the gun in Thorpe's vehicle on August 1, 2018, Tr. 408–12, and claimed that on both occasions he did not know the guns were in the vehicles until arrested by the police. Swan also testified that Officer Kemp's recollection of his statements at the Florissant Police Department were incorrect and that Swan only meant to convey that he was grateful that Thorpe had a gun on her to protect them, not that he knew the gun was in the car. Tr. 417–20.

### E. Post-Trial

After closing argument, the jury returned a verdict of guilty on both Counts I and II. Doc. 78. Counsel filed a timely notice of appeal on Swan's behalf. Doc. 104.

### F. Direct Appeal

Counsel filed an appellate brief pursuant to *Anders v. California*, 386 U.S. 738 (1967), and moved to withdraw. Br. of Appellant, *United States v. Swan*, No. 19-3440 (8th Cir. Mar. 23, 2020). The brief raised three issues that arguably supported an appeal: First,

18

Swan argued that the district court committed plain error when it did not sever Counts I and II for separate trials. Second, Swan argued that the district court plainly erred when it did not grant a judgement of acquittal at the close of the government's case-in-chief and at the close of all of the evidence. Third, Swan argued that Swan's Sixth Amendment rights were violated when being sentenced under the Armed Career Criminal Act. Swan then filed a pro se supplemental brief advancing two additional arguments that the district court erred when it denied his motion to suppress and when it refused to provide certain evidence to the jurors during jury deliberations until the jurors requested the evidence. Supp. Br. of Appellant, *United States v. Swan*, No. 19-3440 (8th Cir. June 18, 2020).

On September 30, 2020, the Eighth Circuit dismissed the appeal, rejecting all of the arguments raised by Swan, and granted counsel's motion to withdraw. *United States v. Swan*, 823 F. App'x 448 (8th Cir. 2020). The Court also "independently reviewed the record under *Penson v. Ohio*, 488 U.S. 75 (1988)" and found "no non-frivolous issues" for appeal." *Id*. at 449–50.

On September 27, 2021, Swan filed the instant motion for post-conviction relief. The Court subsequently ordered the United States to show cause why Swan is not entitled to relief.

## II.    **LEGAL STANDARD**

"Section 2255 was intended to afford federal prisoners a remedy identical in scope to federal habeas corpus." *Sun Bear v. United States*, 644 F.3d 700, 704 (8th Cir. 2011) (en banc) (quotation omitted). Like habeas corpus, this statutory remedy "does not encompass all claimed errors in conviction and sentencing." *Id*. (quoting *United States v. Addonizio*,

442 U.S. 178, 185 (1979)). Under section 2255(a), a petitioner may file a motion for post-conviction review on four specified grounds: "(1) 'that the sentence was imposed in violation of the Constitution or laws of the United States,' (2) 'that the court was without jurisdiction to impose such sentence,' (3) 'that the sentence was in excess of the maximum authorized by law,' and (4) that the sentence 'is otherwise subject to collateral attack.'" *Martin v. United States*, 150 F. Supp. 3d 1047, 1049 (W.D. Mo. 2015) (quoting *Hill v. United States*, 368 U.S. 424, 426–27 (1962)); see also R. GOVERNING § 2255 PROCEEDINGS 1. The petitioner bears the burden of proof as to each asserted ground for relief. *Golinveaux v. United States*, 915 F.3d 564, 567 (8th Cir. 2019) (citation omitted).

"A petitioner is entitled to an evidentiary hearing on a section 2255 motion unless the motion and the files and records of the case conclusively show that he is entitled to no relief." *Anjulo-Lopez v. United States*, 541 F.3d 814, 817 (2008) (internal quotation marks omitted). In other words, "a § 2255 motion can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle him to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Allen v. United States*, 854 F.3d 428, 433 (8th Cir. 2017) (quotation omitted). Moreover, in conducting this inquiry, courts may not give weight to "self-interested characterizations, discredited inventions, or opprobrious epithets." *Simmons v. United States*, No. 1:16-CV-00101-SNLJ, 2016 WL 5941929, at *2 (E.D. Mo. Oct. 13, 2016) (citation omitted).

## III.    ANALYSIS

Swan advances five grounds for post-conviction relief based on allegations of

violations of his Fifth Amendment rights (Argument One), prosecutorial misconduct (Argument Three), ineffective assistance of counsel (Arguments Two and Four), and due process violations (Argument Five). All of Swan's claims fail as a matter of law or are directly contradicted by the record. Thus, the Court will deny his motion to vacate without a hearing.

## A. Fifth Amendment Rights

Swan argues that this Court was wrong to deny his motion to suppress statements that he made to Officer Kemp following his arrest on August 1, 2018. Swan argues that his statements were not spontaneous but rather that he was "actively being questioned," and thus subject to interrogation, when Officer Kemp said that he would have an opportunity to discuss the firearm. Mot. at 14. The R&R issued by Judge Crites-Leoni, and later adopted by this Court, rejected Swan's characterization of Officer Kemp's explanation as interrogation or "reasonably likely to elicit an incriminating response," citing to Eighth Circuit precedent finding no interrogation in a similar circumstance to Swan's. R&R at 7 (citing *United States v. Head*, 407 F.3d 925, 929 (8th Cir. 2005) holding that officer informing a suspect that he wanted "to talk to [suspect] about what had occurred that morning" was not reasonably likely to elicit an incriminating statement)).

While these grounds fail on the merits, Swan already raised claims on direct appeal regarding the district court's alleged error in denying his motion to suppress his statements, *see Swan*, 823 F. App'x at 449, so this issue cannot be revisited on collateral review. "It is well-settled that claims which were raised and decided on direct appeal cannot be relitigated on a motion to vacate pursuant to 28 U.S.C. § 2255." *United States v. Shabazz*,

657 F.2d 189, 190 (8th Cir. 1981); *Dall v. United States*, 957 F.2d 571, 572 (8th Cir. 1992) (per curiam); *Bear Stops v. United States*, 339 F.3d 777, 780 (8th Cir. 2003). The law of the case doctrine requires that the decisions by the Eighth Circuit, handed down on direct appeal, remain undisturbed in subsequent proceedings. *Baranski v. United States*, 515 F.3d 857, 861 (8th Cir. 2008). The Eighth Circuit upheld the district court's denial of Swan's motion to suppress and denied relief on this claim. Thus, the Court will not consider this already-litigated claim. Even if the issue could be relitigated on collateral review, Swan's argument fails on the merits for the reasons accepted by the Court in the R&R.

## B. Prosecutorial Misconduct

In his next set of grounds for relief, Swan alleges that the United States withheld exculpatory evidence, in violation of *Brady vs. Maryland* and its progeny, related to Count II of the Second Superseding Indictment. Specifically, Swan claims that the following items were not disclosed to the defense: (1) an ATF eTrace report for the firearm at issue in Count 2; (2) Swan's jail calls; and (3) the fact that one of the government's witnesses was contesting DWI charges at the time of Swan's trial. Mot. at 35–36. While these arguments fail on the merits, Swan did not raise these arguments on appeal and cannot do so for the first time on collateral review.

"Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." *Bousley v. United States*, 523 U.S. 614, 621 (1998) (internal citation omitted); see also *United States v. Frady*, 456 U.S. 152, 165 (1982) ("a collateral challenge may not do service for an appeal"). Failing to raise such an issue on direct appeal is a procedural default. To properly raise this issue, a movant most show both "cause" for

failure to raise the issue previously, and "actual prejudice" resulting from the error or must be proceeding under the actual innocence exception. *See Bousley*, 523 U.S. at 622; *Frady*, 456 U.S. at 167–68. As to "actual prejudice," a movant must show that the error "worked to [his or her] actual and substantial disadvantage." *Frady*, 456 U.S. at 170. This is a demanding standard; it requires the defendant to carry a burden "significantly higher" than she would be required to satisfy on direct review under the plain-error standard. *Frady*, 456 at 167.

Swan has not alleged cause and actual prejudice. Swan's motion can be read to argue his actual innocence permits him to raise these arguments for the first time on collateral review. *See* Mot. at 36. But the Court cannot excuse Swan's procedural default based on his purported actual innocence. The actual-innocence exception to procedural default requires a petitioner to show that it was "more likely than not that no reasonable juror would have convicted him." *Schlup v. Delo*, 513 U.S. 298, 327–28 (1995). Significantly, "'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623. Swan appears to acknowledge that his claim does not rise to the level needed for an actual-innocence claim. *See* Mot. at 36. In any event, the record demonstrates that there was more than sufficient evidence of Swan's guilt, and Swan does not identify any new evidence that would undercut the jury's verdict. As such, any claim of actual innocence must fail. Even if the Court were to consider Swan's alleged *Brady* violations, his claims fail on merits. *Brady* and its progeny require the United States to produce material evidence that is favorable to the accused. *United States v. Robinson*, 809 F.3d 991, 996 (8th Cir. 2016). Evidence is material "only if there is a 'reasonable probability' that,

had it been disclosed, 'the result of the proceeding would have been different.'" *Id*. (citing *Strickler v. Greene*, 527 U.S. 263, 280 (1999)). "Undisclosed evidence, including impeachment evidence, is 'material' for Brady purposes only if it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Id. at 997 (citing *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). Because the items about which Swan complains either were in fact disclosed to the defense or were otherwise not material, his claims are meritless.

Swan argues that failure to disclose an ATF eTrace report performed for the firearm at issue in Count II, prior to the evidentiary hearing on his motion suppress, constituted a *Brady* violation because the report showed the gun was owned by Swan's girlfriend, Tiara Thorpe. Mot. at 36. But even if not disclosed before the hearing, this report was irrelevant to the issue of suppression. Swan moved to suppress his statements made to Officer Kemp following his arrest on August 1, 2018, arguing they were made before a *Miranda* warning and in response to custodial interrogation. Doc. 35. The only issue at the suppression hearing, then, was whether Swan was being interrogated when he made these statements. R&R at 6.

Whether Swan owned the firearm found in his possession was in no way material to whether Swan was interrogated by Officer Kemp. Interrogation occurs only when there is express police questioning or its "functional equivalent," meaning "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Bailey*, 831 F.3d 1035, 1038 (8th Cir. 2016) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980)). In making this

determination, courts look to the content of and circumstances surrounding statements made by law enforcement immediately prior to a defendant's allegedly suppressible statement. *See United States v. Wipf*, 397 F.3d 677, 685 (8th Cir. 2005) (focusing on officer's statement that he wanted to "tell [the defendant] the situation, and explain the charges against him" in determining that defendant was not interrogated); *United States v. Hull*, 419 F.3d 762, 767 (8th Cir. 2005) ("Whether a particular statement constitutes an interrogation depends upon the circumstances of each case."). Ownership of the firearm found during the traffic stop had no bearing on the circumstances of Swan's statements made later at the Florissant Police Department. The eTrace report indicating that Swan did not own the firearm would have merely confirmed what was an irrelevant fact at this stage. In no way would the disclosure of this report prior to the suppression hearing have led to the suppression of Swan's statements, and it thus was not material.

Swan's jail calls, even if not disclosed, likewise would not have resulted in a different outcome at trial. Swan claims that "there is evidence in jailhouse phone calls between myself and Tiara Thorpe that demonstrated that I had no idea there was a firearm in her vehicle when I was arrested." Mot. at 35. Swan fails to explain why failure to disclose these calls rises to the level of a *Brady* violation. "The government does not suppress evidence in violation of Brady by failing to disclose evidence to which the defendant had access through other channels." *United States v. Zuazo*, 243 F.3d 428, 431 (8th Cir. 2001); see also *United States v. Jones*, 160 F.3d 473, 479 (8th Cir. 1998) ("There is no *Brady* violation if the defendant[s], using reasonable diligence, could have obtained the information themselves." (internal quotations omitted)). It follows that a defendant's own

statements cannot be the basis for a *Brady* violation when the defendant is aware of the content of those prior statements. See *Fullwood v. Lee*, 290 F.3d 663, 686 (4th Cir. 2002) (finding that failure to disclose defendant's statement to detective that he had used cocaine before alleged offense was not a *Brady* violation "because [defendant], better than anyone, knew about his cocaine use on the night prior to the stabbing and knew that he had recounted this fact to [the detective]"). The content of these jail calls—Swan's purported lack of knowledge of the firearm—was clearly known to Swan at trial, and such calls cannot serve as the basis for an alleged *Brady* violation.

Further, Swan does not show how these jail calls were material to his conviction. Undisclosed evidence that is cumulative of the evidence presented at trial is not material under *Brady*. See *United States v. Quintanilla*, 25 F.3d 694, 699 (8th Cir. 1994) (finding that failure to disclose information about witness's drug trafficking history did not constitute a *Brady* violation where witness testified about that history at trial). At trial, Swan testified in his own defense and denied knowingly possessing the firearm at issue in Count II, meaning the jury heard and considered Swan's assertions of his lack of knowledge. In any event, these jail calls and Swan's statements in them would not have been inadmissible. "Self-serving statements are not exempted from the hearsay rule by Federal Rule of Evidence 801(d)(2)(A), or any other exemption or exception, and are thus inadmissible hearsay." *United States v. Quansah*, 171 F. App'x 51, 52 (9th Cir. 2006); see also *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."); *United States v. Larsen*, 175 F. App'x 236, 241 (10th Cir. 2006); *United*

*States v. Cunningham*, 194 F.3d 1186, 1199 (11th Cir. 1999). The outcome of Swan's trial cannot have been impacted by evidence that could not have been introduced regardless.10 Finally, there was substantial evidence of Swan's guilt on Count II. *See Christenson v. Ault*, 598 F.3d 990, 996 (8th Cir. 2010) (finding that "overwhelming evidence" of defendant's guilt renders allegedly undisclosed evidence "immaterial"). As a result, Swan cannot show that his prior out-of-court, self-serving, exculpatory statements would have in any way altered the verdict at trial, and any failure to disclose these calls does not constitute a *Brady* violation.

The final item is easily disposed of based on the record. Swan alleges that the fact that Officer Kemp had pending DWI charges against him during Swan's trial was not disclosed by the United States. However, this information was in fact disclosed. In a motion in limine filed before trial, the United States represented that it had advised Swan's counsel of the pending charges and moved to exclude them as improper impeachment material. Doc. 70 at 1. At the outset of the first day of trial, the Court granted the motion and prohibited counsel from using this information as impeachment material. Tr. 7. Therefore, these materials were disclosed, had limited impeachment value, and could not have been used by Swan at trial regardless. Swan cannot show that any material exculpatory or impeachment evidence was withheld by the United States, and his claims related to *Brady* fail.

## C. <u>Ineffective Assistance of Counsel Arguments</u>

Swan alleges that he received ineffective assistance from his counsel at various stages, specifically at the evidentiary hearing on his motion to suppress, at trial, and on

appeal, but he fails to identify a single instance of deficient performance, much less any prejudice that he faced as a result. Accordingly, the Court must deny Swan relief on this basis.

### 1. Legal Standard for Ineffective-Assistance Claims

"A defendant faces a heavy burden to establish ineffective assistance of counsel pursuant to section 2255." *DeRoo v. United States*, 223 F.3d 919, 925 (8th Cir. 2000) (quotation omitted). Ineffective-assistance claims are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). "This standard requires [a petitioner] to show that his trial counsel's performance was so deficient as to fall below an objective standard of reasonable competence, and that the deficient performance prejudiced his defense." *Nave v. Delo*, 62 F.3d 1024, 1035 (8th Cir. 1995) (quotation omitted) (emphasis added). "Failure to satisfy either [the performance or prejudice] prong is fatal to the claim." *Cole v. Roper*, 579 F. Supp. 2d 1246, 1263 (E.D. Mo. 2008) (citation omitted). Indeed, "[i]f the petitioner makes an insufficient showing on one component, the court need not address both components." *Kingsberry v. United States*, 202 F.3d 1030, 1032 (8th Cir. 2000).

Under the performance prong, courts "apply an objective standard [to] determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Nave*, 62 F.3d at 1035 (quotation omitted). In doing so, a court must be careful to "avoid the distorting effects of hindsight . . . by looking at the circumstances as they must have appeared to counsel at the time." *Rodela-Aguilar v. United States*, 596 F.3d 457, 461 (8th Cir. 2010) (citation omitted). The

starting point for this analysis is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. (citation omitted). Counsel's strategic decisions "made after a thorough investigation of law and facts . . . are virtually unchallengeable," even if those decisions prove unwise. *Strickland*, 466 U.S. at 690.

Under the prejudice prong, the petitioner must show "a reasonable probability that, but for a counsel's unprofessional errors, the result of the proceeding would have been different." *Nave*, 62 F.3d at 1035 (quotation omitted). This inquiry depends on the likelihood of success if the alleged error were corrected. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). "[I]f there is no reasonable probability that the motion would have been successful, [the movant] cannot prove prejudice." *DeRoo*, 223 F.3d at 925.

### 2. Ineffective Assistance at the Evidentiary Hearing

Swan first alleges ineffective assistance by his counsel at the evidentiary hearing. Swan's claims in this regard appear to be twofold. First, Swan claims that effective counsel would have impeached Officer Kemp regarding his memory and lack of documentation of Swan's statements. *See* Mot. at 12–17. Second, Swan claims that effective assistance required counsel to introduce, at the suppression hearing, evidence that the gun in Count II was owned by Swan's girlfriend, Tiara Thorpe. *Id*. at 19–20, 22. However, the record shows that counsel did, in fact, do these things. Regardless, the facts about which Swan complains were not relevant to the issue before the Court at the evidentiary hearing— whether Swan's statements should be suppressed—or would not have otherwise altered the Court's reasoning in denying his motion to suppress.

Swan's allegations about counsel's performance are directly contradicted by the

record. Swan disputes Officer Kemp's testimony about the circumstances and content of his statements. Mot. at 12, 14–16. Swan asserts that the "actual conversation was much more question-and-answer than Kemp's testimony made it appear." *Id.* at 14. However, counsel did cross examine Officer Kemp regarding the circumstances of Swan's statements—namely, that Swan was not *Mirandized* before the statements were made and that his statements were made in response to Officer Kemp's. EH Tr. 16, 19–20. Further, counsel impeached Officer Kemp on the fact that he did not remember the statement verbatim; the fact that he did not memorialize or record these statements; and that other facts were not included in his report. EH Tr. 16–21, 23–24. Counsel went so far as to call the government's case agent as a defense witness in an attempt to identify inconsistencies with Officer Kemp's testimony and to impeach Officer Kemp. EH Tr. 30. Moreover, in post-hearing briefing, counsel expressly challenged Officer Kemp's credibility and his testimony about the circumstances of Swan's statements. Doc. 54 at 5. Thus, a review of the record shows no deficient performance in counsel's inquiry. In fact, Swan himself admits that he cannot disprove Kemp's testimony, *see* Mot. at 16, and does not point to any facts that, had they been made part of the record, would have changed the outcome of the Court's holding.

In addition, ownership of the firearm that Swan possessed was irrelevant to the suppression hearing. Contrary to Swan's claims, the record shows that counsel did introduce evidence that the gun possessed by Swan was owned by Thorpe. EH Tr. 21, 40. Nonetheless, Swan argues that counsel should have investigated and introduced an ATF eTrace report, which would have corroborated that Thorpe owned the firearm. Mot. at 22.

As previously discussed, at issue during the evidentiary hearing was only whether Swan's statements were obtained in violation of the Fifth Amendment. Specifically, whether Swan's statements were in response to interrogation or were "reasonably likely to elicit an incriminating response." *See* R&R at 6. This question turned on Officer Kemp's words to Swan before Swan made the relevant statements. *See Hull*, 419 F.3d at 767; *Wipf*, 397 F.3d at 685. The fact that Swan did not own the firearm found in his possession had no bearing on whether or not Officer Kemp's post-arrest explanation that Swan would have an opportunity to talk about the firearm was "reasonably likely to elicit an incriminating response." Thus, because Swan cannot show that the introduction of an eTrace report would have had any impact on that holding, he cannot establish prejudice.

### 3. Ineffective Assistance at Trial

Swan next raises multiple ineffective-assistance claims with regard to trial counsel, specifically that counsel should have 1) introduced certain relevant evidence at trial; 2) moved for judgment of acquittal; 3) moved for severance; 4) impeached Officer Kemp; and 5) move for a mistrial. As before, many of Swan's allegations of deficient performance are directly contradicted by the record, and, Swan cannot demonstrate any prejudice related to these claims.

#### a. Trial counsel did not provide ineffective assistance by not introducing inadmissible or excluded evidence at trial.

Swan first claims that counsel should have introduced two pieces of evidence at trial: 1) jail calls between himself and Tiara Thorpe during his pretrial detention, and 2) evidence that Officer Kemp had pending DWI charges against him at the time of Swan's

trial. Mot. at 24–25. Neither piece of evidence would have been admissible at trial, and counsel's failure to introduce this evidence was neither deficient nor prejudicial.

As previously discussed a defendant cannot offer his own self-serving, exculpatory statements at trial. According to Swan, his statements on jail calls, though he does not describe them in detail, would have corroborated his claim that he did not know there was a firearm in the vehicle when he was arrested on August 1, 2018. Mot. at 29. These self-serving, out-of-court statements are inadmissible hearsay and could not have been offered by counsel at trial. *See Marin*, 669 F.2d at 84; *Larsen*, 175 F. App'x at 241; *Cunningham*, 194 F.3d at 1199. Defense counsel was not deficient for failing to offer inadmissible evidence. *See Becker v. Luebbers*, 578 F.3d 907, 916 (8th Cir. 2009) (agreeing with state court's conclusion that "trial counsel was not ineffective for abiding by the evidentiary rule applicable at the time of trial"); *see also Hoots v. Allsbrook*, 785 F.2d 1214, 1222 (4th Cir. 1986) ("[Counsel's] decision not to attempt to introduce inadmissible evidence at the [] trial did not constitute ineffective assistance of counsel."); *Kavanaugh v. Berge*, 73 F.3d 733, 736 (7th Cir. 1996) (finding failure to offer evidence was not ineffective assistance of counsel, in part, because "there was no way for [counsel] to introduce this evidence"). Even so, Swan testified in his own defense that he did not know the firearm was in the vehicle. Tr. 408–12, 418. Thus, Swan's claimed lack of knowledge of the firearm was before the jury, and there was no prejudice from not introducing the jail calls.

As to Officer Kemp's pending criminal case, counsel could not have introduced evidence of a witness's pending DWI charges because the Court had ruled that the evidence was inadmissible. In advance of trial, the United States filed a motion in limine to preclude

32

defense counsel from cross examining Officer Kemp at trial regarding his pending case. Doc. 70. In its motion, the United States argued that pending charges against Officer Kemp from another jurisdiction, and ones in which the United States had no intention or opportunity to intervene, had no bearing on the credibility of that witness's testimony. *Id*. at 2–3. On the first morning of trial, the Court took up the motion, and counsel informed the Court that the defense did not intend to impeach the officer regarding these charges and had no objection to the motion. Tr. 7. The Court then granted the motion. Tr. 7. Thus, this evidence was similarly inadmissible at trial, and counsel was not deficient for not attempting to offer it.

### b. A motion for directed verdict was meritless, and Swan suffered no prejudice from trial counsel not making this motion.

Swan claims that counsel provided ineffective assistance in failing to move for directed verdict during or after trial. Because such a motion was meritless, and Swan cannot demonstrate any prejudice that he suffered as a result given the substantial evidence against him. *See Maynard v. Lockhart*, 981 F.2d 981, 987 (8th Cir. 1992) (finding counsel was not ineffective in not moving for a directed verdict where government presented sufficient evidence to support verdict); *United States v. Moore*, 921 F.2d 207, 210 (9th Cir. 1990) ("[T]he lawyer's failure to move for a directed verdict

did not prejudice [defendant] because it would have been meritless."); *Maupin v. Smith*, 785 F.2d 135, 140 (6th Cir. 1986) (finding no prejudice in counsel failing to move for a directed verdict where there was sufficient evidence to support conviction).

A defendant can succeed on a motion for directed verdict only if there is

"insufficient evidence to sustain a conviction." Fed. R. Crim. P. 29. When reviewing the sufficiency of the evidence on a motion for directed verdict, the court "view[s] the evidence in the light most favorable to the guilty verdict, resolving all evidentiary conflicts in favor of the government, and accepting all reasonable inferences supported by the evidence." *United States v. Gonzalez*, 826 F.3d 1122, 1125–26 (8th Cir. 2016). "A motion for judgment of acquittal should be granted only 'if there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." *United States v. Cacioppo*, 460 F.3d 1012, 1021 (8th Cir. 2006) (quoting *United States v. Gomez*, 165 F.3d 650, 654 (8th Cir. 1999)). A court has "very limited latitude" in reviewing the sufficiency of the evidence. United States v. Robbins, 21 F.3d 297, 298–99 (8th Cir. 1994). "The district court does not weigh the evidence or assess the credibility of witnesses." *United States v. Thompson*, 285 F.3d 731, 733 (8th Cir. 2002) (quoting *Robbins*, 21 F.3d at 299).

The only element that Swan contested at trial was that he knowingly possessed a firearm. Possession can be either actual or constructive. *United States v. Ellis*, 817 F.3d 570, 576 (8th Cir. 2016). "A defendant may be in constructive possession of a firearm if he has 'dominion and control' over the firearm itself." *Id*. The Eighth Circuit has held that a defendant's dominion and control over a vehicle may indicate knowledge of the vehicle's contents. *See United States v. Parker*, 587 F.3d 871, 881 (8th Cir. 2009). Constructive possession satisfies the element of knowing possession. *Ellis*, 817 F.3d at 576.

Thus, on a motion for directed verdict, the Court would have been asked to determine whether, viewing the evidence in the light most favorable to the United States,

there was sufficient evidence that Swan knowingly possessed the firearms alleged in Counts I and II. Swan argues that he did not know the guns were in his vehicle on both occasions and that there was "not enough evidence to demonstrate to a reasonable juror that I had constructive possession of that firearm [in Count II]." Mot. at 25. The record shows otherwise.

Regarding Count I, the United States presented evidence showing that, after officers attempted to pull over Swan after he was observed speeding, Swan led police on a high-speed chase. Tr. 116–19; 142–45. Swan eventually crashed into a parked vehicle and continued fleeing on foot. Tr. 120–23; 145–48. Officers found a firearm—the one charged in Count I—inside the pocket of the driver's side door, easily accessible and observable to the driver's left. Tr. 159–62. Swan was left-handed. Tr. 285. Also inside the vehicle were bank cards in the name of Swan. Tr. 163. The vehicle belonged to Swan, and he was known by officers to frequently drive this vehicle. Tr. 115–16. Finally, the firearm was registered to someone other than Swan and who indicated the gun was missing. Tr. 125–27; 210–11. In short, a gun was found in a vehicle that belonged to Swan, was being driven by Swan, and in a position that would have been easily accessible and readily apparent to him while driving. As a result, there was more than sufficient evidence for a reasonable jury to find Swan's constructive possession of this firearm.

As to Count II, the evidence showed that Swan was a passenger in a vehicle during a traffic stop. Tr. 223–25. When asked for identification, Swan provided a false name and false identifiers to the officer. Tr. 226–29. A jury could reasonably infer from Swan's lies to the officer his consciousness of guilt regarding the firearm in his possession. After

35

learning of an active federal arrest warrant for Swan, the officer placed Swan under arrest. Tr. 229. As Swan exited the vehicle, the officer observed a handgun lying on the seat where Swan had been sitting. Tr. 239–242. The firearm was positioned on the left side of Swan. Tr. 241. The placement of the firearm gave Swan ready access, demonstrating dominion and control over the weapon. While still at the scene, the officer heard Swan tell the driver, Tiara Thorpe, something to the effect of, "I'm finished, I'm done." Tr. 246–47. The United States introduced police radio dispatch logs corroborating the officer's description of the traffic stop and Swan's arrest. Tr. 215–22. Later, after Swan was transported to the police station for processing, Swan told the booking officer, "We both know what you found in the vehicle, and I'd rather be in a position that I'm in now than one that I was in in the past when I was shot and didn't have anything on me." Tr. 250. It was entirely reasonable for a jury to interpret Swan's statements as admissions to possessing a firearm. Accepting Officer Kemp's testimony, as a court must on a motion for directed verdict, there was more than sufficient evidence for a reasonable juror to conclude that Swan knowingly possessed the firearm.

Therefore, any motion for directed verdict was fruitless, and, in light of the evidence against him, Swan was in no way prejudiced by counsel not making such a motion.

### c. Trial counsel impeached Officer Kemp and Officer Eggers at trial, and there was no ineffective assistance in this regard.

Swan next claims that trial counsel's cross examination of Officer Kemp was deficient and alleges that counsel "failed to impeach this witness against me on Count 2 on these numerous occasions when a competent attorney could do so." Mot. at 31. Swan raises

similar claims as those relating to the evidentiary hearing on his motion to suppress, and as with those prior claims, his claims here are directly contradicted by the record.

Swan first alleges that Officer Kemp authored his report on August 8, 2018, rather than the date of Swan's arrest, August 1, 2018, as Officer Kempt testified. Id. at 27–28. The import of this fact, according to Swan, was that it showed Officer Kemp did not believe Swan owned the firearm in Count II, and Swan argues counsel should have impeached Officer Kemp on this allegation. *Id*. at 27–30. But counsel did just that:

> Q:      And the actual date of your encounter with Mr. Swan, of course is August 1st of 2018; correct?
>
> A:      Correct.
>
> Q:      But your police narrative indicates that the event happened on Wednesday, August the 8th of 2018; correct?
>
> A:      That's correct.
>
> Q:      Why is that date wrong?
>
> A:      It's just a clerical error on my part. I typed in 8, and it should have been the 1st.
>
> Q:      So it's your testimony when you sat down to write your report on August the 1st of 2018, you accidentally thought it was Wednesday, August the 8th instead?
>
> A:      Correct.
>
> Q:      You got the date of August 1 correct on all the booking sheets; is that right?
>
> A:      Correct.
>
> Q:      You got the date of August 1st correct when you hand signed the St. Louis County Police Department evidence sheet?

37

A:     Correct.

Q:     And all those sheets were signed on August the 1st?

A:     Correct.

Q:     So when it came time to write the narrative, you got the date of the correct Wednesday of Mr. Swan's arrest wrong?

A:     Yes, ma'am.

Q:     And you read your police narrative after you completed it?

A:     Yes.

Q:     And you didn't catch this error when you proofread your narrative?

A:     I did not.

Tr. 269–270. Counsel further questioned Officer Kemp about all of the other police personnel who reviewed the report and did not catch the mistake. Tr. 271–72. The record shows, then, that there was no deficient performance in this regard.

Related to his first allegation, Swan next alleges that counsel failed to impeach Officer Kemp on the fact that Tiara Thorpe claimed ownership of the gun and in fact owned the gun. Mot. at 27–28. Again, the record shows the opposite. In response to counsel's cross examination, Officer Kemp acknowledged that Thorpe told him at the scene that the gun was hers, and that this fact was not reflected in his police report. Tr. 261–62. Counsel also impeached Officer Kemp with an ATF eTrace report that indicated Thorpe owned the firearm. Tr. 263–64. Again, the record makes clear that counsel impeached Officer Kemp precisely how Swan complains she should have.

In his final claim, Swan alleges that Officer Kemp testified differently at trial than

at the evidentiary hearing regarding the placement of the gun in the vehicle. Mot. at 31. Swan compares Officer Kemp's earlier testimony that firearm "was towards the left edge of the front right passenger seat back by the seat belt holster," to his trial testimony that he "observed a firearm or handgun sitting on the passenger seat where Mr. Swan's previously sitting." *Id*. Swan claims that counsel should have impeached Officer Kemp on this basis. It is not apparent that these statements are inconsistent rather than differently worded. Regardless, the operative fact in Officer Kemp's testimony was that the gun was in the seat where Swan had been sitting and accessible to him, not the orientation or exact position of the gun. It therefore was reasonable for counsel to not introduce this alleged discrepancy during cross examination. Swan's assertion that he was prejudiced by counsel not impeaching on this basis does not satisfy his burden under *Strickland*. *See Sherron v. Norris*, 69 F.3d 285, 290–91 (8th Cir. 1995) ("A claim of ineffective assistance cannot be based on decisions that relate to a reasoned choice of trial strategy, even when it later may be shown improvident.").

Based on the record, Swan's assertion of prejudice is without merit, and his claims of ineffective assistance fail.

### d. Trial counsel did not provide ineffective assistance by not moving for a mistrial based on a sleeping juror who was later substituted for an alternate.

Swan argues the decision to not move for a mistrial constituted ineffective assistance of counsel. Swan claims that jurors at his trial had "already made up their mind" and "clearly convicted me before the defense's case in chief was even presented." Mot. at 31, 34. In support of his claim, Swan points to jurors falling asleep during trial and one

39

juror being dismissed in the middle of trial. *Id*. at 32. Swan asserts that he was entitled to a mistrial and that counsel's decision to not seek a mistrial was laziness rather than strategic. *Id*. at 33. Even assuming that counsel's performance was deficient, Swan has not demonstrated any prejudice from failing to move for a mistrial, and so his claim fails.

Swan is incorrect that a mistrial would have been mandatory had counsel moved for it. "The trial judge has broad discretion to grant or deny a motion for a mistrial." *United States v. Trevino-Rodriguez*, 994 F.2d 533, 535 (8th Cir. 1993) (citing *Illinois v. Somerville*, 410 U.S. 458, 462 (1973)). Jurors sleeping during portions of trial, by itself, does not require a mistrial. *See United States v. Tierney*, 947 F.2d 854, 868 (8th Cir. 1991); *United States v. McKeighan*, 685 F.3d 956, 973 (10th Cir. 2012) ("As a general rule, juror misconduct, such as inattentiveness or sleeping, does not warrant a new trial absent a showing of prejudice."). Here, after defense counsel alerted the Court that some jurors were falling asleep, the Court responded:

> I will state that I did notice some people nodding off, but I didn't think anybody was asleep or anything like that. It's not much different than a lot of trials. I didn't really think that it was of that significant.

Tr. 207–08. Immediately thereafter, the Court admonished the jurors that "several of you appear to be nodding off a little bit. Please pay strict attention to everything that's going on during the trial." Tr. 208. The only juror who continued to fall asleep during trial was Juror No. 7, who was later excused and substituted with the alternate juror for an unrelated reason. Tr. 298–99. The Eighth Circuit has affirmed the denial of motions for mistrial by trial courts in similar circumstances. *See United States v. Evans*, 272 F.3d 1069, 1087 (8th Cir. 2001) (finding no abuse of discretion where, once a sleeping juror was brought to the

court's attention, the court "stated that it would watch the juror and order more recesses" and later added "that it had been watching the juror, concluding that 'he's been okay'"); *United States v. Maksimov*, 39 F. App'x 462, 463 (8th Cir. 2002) (finding no abuse of discretion in refusal to grant mistrial where "the court stated that it had watched the jury to see if there were any problems with sleeping jurors" and replaced a juror who had "fallen asleep on a couple of occasions"). It follows that the Court would have been well within its discretion to deny a motion for mistrial.

In any event, Swan fails to demonstrate how a different verdict would have been reached on retrial, had a mistrial been granted. "[A] general assertion that jurors slept through parts of the critical presentation of defendant's evidence and the cross-examination of witnesses for the prosecution . . . are too vague to establish prejudice." *Tierney*, 947 F.2d at 868–69 (internal quotations omitted). To demonstrate prejudice, Swan must identify some specific evidence that the jurors missed and how that evidence was important to the outcome of the trial. *See Barton v. Jennings*, No. 4:19-CV-00240-JMB, 2021 WL 1238212, at *5 (E.D. Mo. Apr. 2, 2021) (finding petitioner could not show prejudice "in the absence of specific evidence of what jurors missed"); *Johnson v. Norman*, No. 4:17-CV-02666-SEP, 2021 WL 1666879, at *6 (E.D. Mo. Apr. 28, 2021) ("Petitioner has not identified what important evidence or testimony might have been missed while the juror dozed off, or how that may have prejudiced his case."); *Smith v. Roper*, No. 4:08-CV-01529-MLM, 2009 WL 2182153, at *30 (E.D. Mo. July 22, 2009) (finding allegation that sleeping jurors missed critical evidence "too vague to warrant a mistrial"). Swan has not done so. Swan does not point to any specific pieces of evidence that were missed while certain jurors

appeared to fall asleep. *See* Mot. at 31–34. In fact, the record suggests that inattentive jurors missed only the direct examination of prosecution witnesses. *See* Tr. 207–08, 236–37. There is no indication that jurors missed the testimony of any defense witnesses or any cross examination by defense counsel. *Cf. Tierney*, 947 F.2d at 869 (finding no prejudice where jurors alleged to have missed "critical presentation of [defendant's] evidence and the cross examination of witnesses for the prosecution"). It is difficult to imagine how jurors missing the portions of trial that would have been most incriminating against Swan resulted in any prejudice towards him. Further, the only juror who appeared to fall asleep on more than one occasion was ultimately dismissed and did not participate in jury deliberations. Swan's assertion that jurors were sleeping because they had already made up their minds amounts to a vague, general assertion that cannot establish prejudice.

### 4. Appellate counsel was not ineffective for filing an *Anders* brief.

Swan makes one last ineffective-assistance claim concerning counsel's decision to file an *Anders* brief. Mot. at 37–38. Specifically, he contends that "there were multiple issues with obvious merit that could have, and should have, been argued on direct appeal," in particular, *Brady* violations, *Giglio* violations, and "improper rulings at suppression and trial." *Id*.

The filing of an *Anders* brief in and of itself does not constitute ineffective assistance of counsel. *Garrison v. United States*, No. 15-0209-CV-W-ODS, 2015 WL 3823665, at *7 (W.D. Mo. June 19, 2015) ("Such a holding would not only put this Court in the position of second-guessing the Court of Appeals' approval of the filing of the *Anders* brief, but would eviscerate the Supreme Court's holding in *Anders* in which the procedure was

approved."). "Generally, when counsel submits an *Anders* brief, the [Eighth Circuit] independently reviews the record for any nonfrivolous issue." *United States v. Davis*, 508 F.3d 461 (8th Cir. 2007) (citation omitted). "If the court finds a nonfrivolous issue, it will direct counsel to more fully brief the issue." *Id.* (citation omitted). Here, on direct appeal, the Eighth Circuit "independently reviewed the record under *Penson v. Ohio*" and "found no non-frivolous issues." *Swan*, 823 F. App'x at 449–50. This finding "demonstrates irrefutably that there is no issue, if raised on appeal, that would have likely resulted in reversal." *See Cockrell v. United States*, No. 4:11-CV-00765-SNLJ, 2012 WL 487651, at *13 (E.D. Mo. Feb. 15, 2012); see also *United States v. Perez-Carrillo*, 365 F. App'x 32, 33 (8th Cir. 2010) (finding lack of prejudice in light of appellate court's independent review).

Swan's allegations that counsel should have raised additional arguments on appeal also does not establish deficient performance. While the defendant decides whether to pursue an appeal, "the choice of what specific arguments to make within that appeal belongs to appellate counsel." *Garza v. Idaho*, 139 S. Ct. 738, 746 (2019). Because "effective appellate advocacy often entails screening out weaker issues, the Sixth Amendment does not require that appellate counsel raise every colorable or non-frivolous issue on appeal." *Roe v. Delo*, 160 F.3d 416, 418 (8th Cir. 1998). A defendant has no constitutional right to compel counsel to "press nonfrivolous points" if counsel, "as a matter of professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Nor is counsel required to raise an "unwinnable issue" on appeal. *Horne v. Trickey*, 895 F.2d 497, 500 (8th Cir. 1990).

Absent contrary evidence, "we assume that appellate counsel's failure to raise a claim was an exercise of sound appellate strategy." *Sidebottom v. Delo*, 46 F.3d 744, 759 (8th Cir. 1995) (citations and internal quotations omitted). "This process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones*, 463 U.S. at 751–52); see also *Reese v. Delo*, 94 F.3d 1177, 1185 (8th Cir. 1996) ("Counsel has discretion to abandon losing issues on appeal."). Indeed, presenting every single issue on appeal is often detrimental, because judicial "receptiveness declines as the number of assigned errors increases. Multiplicity hints at lack of confidence in any one." *Jones*, 463 U.S. at 752.

Here, Swan has not identified any credible issues that counsel should have appealed, and as the record makes clear, there were not any. Any alleged *Brady* and *Giglio* violations were examined in response to Swan's other arguments, and for the same reasons, those arguments would have lacked merit on appeal. Though Swan does not specify what other "violations and improper rulings" counsel should have raised on appeal, Swan himself raised several more issues in his pro se supplemental appellate brief, further demonstrating that he was not prejudiced by counsel's choice of arguments. Regardless, the Eighth Circuit determined there were no non-frivolous issues based on an independent review of the record. Swan, 823 F. App'x at 449–50. Given that the record precludes a finding of prejudice, Swan's final ineffective-assistance claim fails.

### D. <u>Due Process Violations</u>

Swan lastly claims that the delay between his arrest on August 1, 2018, in Florissant,

Missouri by local law enforcement and his initial appearance before the Court in Cape Girardeau, Missouri on August 17, 2018, was "unnecessary" under Federal Rule of Criminal Procedure 5(a) and a violation of the Due Process Clause. Mot. at 38–39. Swan indicates that he was transferred to federal custody on August 15, 2018, and he was arraigned two days later. *Id*. at 39. "[W]here a state arrest precedes a federal arrest, any delay in arraignment under Rule 5(a) runs from the time of the federal arrest, absent a showing of collusion with state officers." *Little v. United States*, 417 F.2d 912, 914–15 (9th Cir. 1969) (citing *Young v. United States*, 344 F.2d 1006 (8th Cir. 1965)); see also *United States v. Johnson*, 540 F.2d 954, 960–61 (8th Cir. 1976) (finding no due process violation where time between state arrest and federal arraignment was not result of "working agreement" between authorities). Swan also does not allege any prejudice from the delay. *See United States v. Nazarenus*, 983 F.2d 1480, 1483 (8th Cir. 1993) ("This court has held that, absent a showing of prejudice to the defendant, unnecessary delays between arrest and arraignment are not cause for setting aside a conviction."); *Johnson*, 540 F.2d at 961 (finding no prejudice in delay between arrest by state officials and federal arraignment).

In any event, these claims are not cognizable here. Swan procedurally defaulted any arguments concerning post-arrest delay by failing to raise them on appeal. *See Bousley*, 523 U.S. at 621; *Frady*, 456 U.S. at 165. Furthermore, as the Eighth Circuit has long made clear, claims relating to "a delay in bringing the petitioner before a commissioner" are not cognizable on a motion to vacate a sentence. *See United States v. Houser*, 508 F.2d 509, 514 (8th Cir. 1974) (citing *Adkins v. United States*, 298 F.2d 842, 843 (8th Cir. 1962), cert. denied, 370 U.S. 954 (1962)). Accordingly, the Court will dismiss this claim as a matter of

law.

## IV.  <u>PETITIONER'S FIRST SUPPLEMENT</u>

On May 5, 2022, Swan filed a Motion to Amend/Correct his Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255. *Swan v. United States*, No. 1:21-CV-00142-SNLJ ("Civil Case"), Doc. 15. In his Motion to Amend/Correct, Petitioner sought leave to raise an additional ground for post-conviction relief based on the Supreme Court's recent decision in *Wooden v. United States*, 142 S. Ct. 1063 (2022) (decided Mar. 7, 2022). The Court subsequently granted Petitioner's Motion to Amend/Correct and ordered the parties to submit additional briefing on the Motion. Civil Case, Doc. 16. Because *Wooden* is inapplicable to Petitioner's case and his claim is untimely, the Court will reject this additional claim and deny Petitioner's Motion to Vacate, Set Aside, or Correct Sentence without a hearing.

### A. <u>Relevant Background</u>

Following a two-day jury trial, in which Swan was convicted of two counts of being a felon in possession of a firearm, the U.S. Probation Office (the "Probation Office") issued its final presentence investigation report ("PSR") on October 25, 2019. Doc. 98. In paragraph 24 of the PSR, the Probation Office determined that Swan had "at least three prior convictions for a violent felony or serious drug offense, or both, which were committed on different occasions" and thus is subject to the fifteen-year mandatory minimum sentence under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). PSR at ¶ 24. The Probation Office concluded that three convictions qualified under the ACCA.

First, on October 12, 2004, Swan was sentenced to 8 years' imprisonment following a conviction for Distributing/Delivering/Manufacturing with Intent to Distribute a Controlled Substance in the Circuit Court of Cape Girardeau County, Missouri (Case No. 04G9-CR00856-01). Id. at ¶ 37. According to court records, on August 29, 2003, Swan "distributed crack cocaine (.31 grams of cocaine base), a controlled substance, to J.M., an undercover police officer, knowing that it was a controlled substance." *Id*.

Second, on September 26, 2006, Swan was sentenced to 57 months' imprisonment based on conviction for Distribution of Cocaine in the United States District Court for the Eastern District of Missouri (Case No. 1:05-CR-00148-RWS). *Id*. at 47. Based on court records, on March 16, 2005, in Cape Girardeau County, Missouri, Swan "knowingly and intentionally distributed cocaine, a Schedule II narcotic controlled substance." *Id*. The PSR described the facts underlying the conviction: "[O]n March 16, 2005, the Southeast Missouri Drug Task Force began a narcotics investigation utilizing a confidential informant (CI). A controlled purchase of crack cocaine was scheduled between the CI and Swan. The transaction was audio and video recorded. The CI responded to the meeting location and picked up Swan. They drove to a residence where Swan distributed 7.4 grams of 93% pure cocaine to the CI for $225 in United States currency." *Id*.

Third, on September 26, 2006, Swan was also sentenced in the same case in the United States District Court for the Eastern District of Missouri for a separate conviction of Distribution of Cocaine. *Id*. Based on court records, on April 5, 2005, in Cape Girardeau County, Missouri, Swan "knowingly and intentionally distributed cocaine, a Schedule II narcotic controlled substance." *Id*. According to the PSR, "On April 5, 2005, another

controlled purchase of crack cocaine was scheduled between the CI and Swan. At the meeting location, Swan distributed 6.3 grams of 85% pure cocaine to the CI for $250 in United States currency." *Id*.

Prior to sentencing, Swan objected to the application of the fifteen-year mandatory minimum sentence under the ACCA to his case. Doc. 89. Relevant here, Swan argued that his two convictions for Distribution of Cocaine should not be counted as two separate offenses under the ACCA because "there was no intervening arrest between the incidents, and the incidents were part of a continuing undercover sting . . . utilizing the same task force officers and confidential informant." *Id*. at 3. The Probation Office disagreed with Swan's objection and addressed his argument in the PSR:

> In *United States v. Van*, No.: 07-3812, (October 3, 2018), the Eighth Circuit upheld that "predicate offenses under the ACCA are limited to those committed on occasions different from one another . . . each distinct episode is a separate predicate offense, regardless of the date of conviction or the number of trials or pleas," and "we have repeatedly held that convictions for separate drug transactions on separate days are multiple ACCA predicate offenses, even if transactions were sales to the same victim or informant. Furthermore, in the defendant's objection, he admits that the current case per *Van* is the presiding decision in the Eighth Circuit, and he is merely filing the objection to preserve the right to appeal."

PSR Addendum at 3–4.

At sentencing on October 28, 2019, the Court overruled Swan's objections to the PSR and accepted the PSR without changes. Doc. 117 at 7 (Sentencing Transcript). the Court determined that Swan's objections "have been addressed by the Eighth Circuit Court of Appeals, and [that the Court was] bound by the Eighth Circuit rulings on all of those objections." *Id*. Having determined that Swan was an armed career criminal under the ACCA, the Court sentenced Swan to the mandatory minimum of 180 months in prison. *Id*.

at 15; Doc. 101.

On November 8, 2019, Swan filed a timely notice of appeal. Doc. 104. On appeal, Swan did not reassert his argument that the ACCA did not apply to his case because his two convictions for Distribution of Cocaine were not committed on separate occasions. See Br. of Appellant, *United States v. Swan*, No. 19-3440 (8th Cir. Mar. 23, 2020); Supp. Br. of Appellant, *United States v. Swan*, No. 19-3440 (8th Cir. June 18, 2020). On September 30, 2020, the Eighth Circuit dismissed the appeal and affirmed the judgment. *United States v. Swan*, 823 F. App'x 448 (8th Cir. 2020). Swan did not file a petition for a writ of certiorari, and his conviction became final on February 27, 2021.

On September 27, 2021, Swan filed his Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255. Civil Case, Doc. 1. On March 21, 2022, the United States filed its response. Civil Case, Doc. 12. Then, on April 18, 2022, Swan filed a motion seeking leave to file a reply to the United States' response, which the Court granted, giving Swan until June 1, 2022, to file his reply. Civil Case, Docs. 13 and 14. Before doing so, on May 5, 2022, more than one year after his conviction became final, Swan filed a Motion to Amend/Correct his Motion to Vacate, seeking leave to amend his § 2255 motion based on the Supreme Court's recent decision addressing the ACCA in *Wooden v. United States*, 142 S. Ct. 1063 (2022) (decided Mar. 7, 2022).

## B. **The *Wooden* Decision**

In *Wooden*, the Supreme Court addressed the meaning of "occasions different from another" as used in the ACCA. 142 S. Ct. at 1067. The Court considered the case of a defendant who burglarized ten different units in a storage facility on the same evening. *Id*.

49

The defendant and his confederates did so by "crushing the interior drywall" between them, burglarizing each unit one after the other. *Id*. Defendant was charged with and pleaded guilty to ten counts of burglary, one count for each burglarized storage unit. *Id*.

Seven years later, the defendant was charged and convicted of being a felon in possession of a firearm in violation of Title 18, United States Code, Section 922(g). *Id*. at 1067–68. At sentencing, the district court determined that the defendant's ten prior burglary convictions were committed "on occasions different from another," such that each constituted a predicate offense for purposes of the ACCA. *Id*. at 1068. Therefore, the district court applied the mandatory minimum fifteen years' imprisonment under the ACCA. *Id*. On appeal, the defendant argued that the ten burglary convictions, committed in one evening in a singular location, were not "occasions different from one another." *Id*. The Supreme Court agreed and reversed.

In doing so, the Supreme Court rejected an interpretation of the ACCA that categorically treated offenses committed sequentially as occurring on different occasions. Instead, the Court explained that the "occasions different from one another" inquiry is "more multi-factored in nature." *Id*. at 1070. The Court indicated that "a range of circumstances may be relevant to identifying episodes of criminal activity." *Id*. at 1071. Among them, the Court wrote, "[t]iming of course matters." *Id*. "Offenses committed close in time, in an uninterrupted course of conduct, will often count as part of one occasion; not so offenses separated by substantial gaps in time or significant intervening events." *Id*. Also important is "proximity of location," meaning "the further away crimes take place, the less likely they are components of the same criminal event." *Id*. Though multiple factors may

be relevant to this determination, the Court made clear that "[i]n many cases, a single factor—especially of time or place—can decisively differentiate occasions. Courts, for instance, have nearly always treated offenses as occurring on separate occasions if a person committed them a day or more apart." *Id*.

### C. Swan's *Wooden* argument is untimely under the statute of limitations set forth in § 2255(f) and is therefore non-cognizable.

The Court will not consider the merits of Swan's new claim because it is time-barred. A one-year time limit applies to a motion under § 2255, starting from the latest of, relevant here, the following: "(1) the date on which the judgment of conviction becomes final; . . . [or] (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." 28 U.S.C. § 2255(f). Although "not a jurisdictional bar," *Moore v. United States*, 173 F.3d 1131, 1134 (8th Cir. 1999), a district court is precluded from considering the merits of untimely claims where, as here, the United States timely raises a statute-of-limitation defense. *See United States v. Craycraft*, 167 F.3d 451, 457 (8th Cir. 1999); *Campa-Fabela v. United States*, 339 F.3d 993, 993–94 (8th Cir. 2003). The one-year statute of limitations bars Swan from now challenging his designation as an armed career criminal.

### 1. Swan's claim is untimely because Swan raised it for the first time on collateral review more than one year after his conviction became final.

Swan's claim regarding the ACCA is untimely under § 2255(f)(1) because it was raised for the first time in his Motion to Amend/Correct on May 5, 2022, more than one year after his judgment of conviction became final on February 27, 2021. Under §

2255(f)(1), Swan was required file a § 2255 motion no later than February 27, 2022. *See Mora-Higuera v. United States*, 914 F.3d 1152, 1154 (8th Cir. 2019). Though Swan's original Motion to Vacate was filed before this deadline, his Motion to Amend/Correct was not. The Eighth Circuit has made clear that a motion to amend filed after the one-year statute of limitations has expired is considered timely only if the amended claims "relate back" to those previously raised timely claims. *Taylor v. United States*, 792 F.3d 865, 869–71 (8th Cir. 2015).

Swan's new claim alleging error in his sentencing does not "relate back" to the claims raised in his original § 2255 motion. An amendment to a pleading shall "relate back" to the date of the original pleading only if the claim asserted in the original pleading and the claim asserted in the amended pleading arose out of the same conduct, transaction, or occurrence. *See* Fed. R. Civ. P. 15(c)(2); *see also Craycraft*, 167 F.3d at 457 (applying "relate-back" doctrine*); Mandacina v. United States*, 328 F.3d 995, 999–1002 (8th Cir. 2003) (same); *Taylor*, 792 F.3d at 869–71 (same)."To arise out of the same conduct, transaction, or occurrence, the claims must be tied to a common core of operative facts." *Taylor*, 792 F.3d at 869. "New claims must arise out of the 'same set of facts' as the original claims, and '[t]he facts alleged must be specific enough to put the opposing party on notice of the factual basis for the claim.'" *Id*. (citing *Mandacina*, 328 F.3d at 1000 (noting that the facts of the claim must also be similar in both time and type)). In no way does the new claim in Swan's Supplemental Motion "arise out of the same conduct, transaction, or occurrence" as his original Motion to Vacate. Swan's original motion raised only purported trial errors and claims alleging ineffective assistance of counsel. Swan did not make any

arguments regarding the Court's application of the ACCA to his case or, for that matter, any claims relating to his sentencing whatsoever. Swan's new claim rests on a different set of facts—namely his criminal history and sentencing as an armed career criminal—than the facts underlying his original Motion to Vacate, and thus it does not "relate back" to the date his original motion was filed. Accordingly, his new claim is out-of-time and barred under § 2255(f)(1).

### 2. Swan's claim is untimely because *Wooden* did not recognize a new rule applicable to Swan's case.

Swan's new claim is also untimely under § 2255(f)(3). Under that section, the one-year statute of limitation may restart from the date of a Supreme Court decision if that decision recognizes a new right made retroactive on collateral review. "[T]he inquiry into whether a right is 'newly recognized' under § 2255(f)(3) tracks the analysis used to determine 'whether the Supreme Court announced a "new rule" within the meaning of the Court's jurisprudence governing retroactivity for cases on collateral review." *Russo v. United States*, 902 F.3d 880, 882 (8th Cir. 2018) (citing *Headbird v. United States*, 813 F.3d 1092, 1095 (8th Cir. 2016)). Swan appears to assume that *Wooden* announced a new rule and argues that this new rule applies retroactively. Supp. Mot. at 11–13. Even assuming arguendo that to be the case, as the Eighth Circuit has recognized, the timeliness of Swan's new claim depends on the particular right asserted—"whether he is asserting the right initially recognized in [*Wooden*] or whether he is asserting a different right that would require the creation of a second new rule." *Russo*, 902 F.3d at 883.

For *Wooden* to excuse Swan's untimeliness under § 2255(f)(3), the *Wooden*

decision must have recognized a right for Swan's two separate prior convictions for cocaine distribution to be treated as one for purposes of the ACCA. *Wooden* did no such thing. Instead, *Wooden*, in clarifying the meaning of "different occasions" under the ACCA, merely rejected a strict interpretation whereby multiple offenses were necessarily deemed committed on different occasions if committed "sequentially" or "at different moments of time." *Wooden*, 142 S. Ct. at 1068. Swan fails to demonstrate how application of the ACCA reaches a different result in his case after *Wooden*. Unlike the ten burglaries in *Wooden*, which were committed one after the other "on a single night, in a single uninterrupted course of conduct . . . at one location," Swan's two federal drug offenses were committed weeks apart. *Id*. at 1071. As the Supreme Court made clear in *Wooden*, this fact alone can distinguish offenses. *Id*. Indeed, the Supreme Court cited with approval cases that had "treated offenses as occurring on separate occasions if a person committed them a day or more apart." *Id*. Thus, Swan's claimed right to not be sentenced under the ACCA would "require[] an extension, not an application" of *Wooden*. Cf. *Russo*, 902 F.3d at 882–83 (finding that Supreme Court decision invalidating residual clause of ACCA supported a different right than the one asserted by petitioner—that similar residual clause in U.S. Sentencing Guidelines was invalidated—such that § 2255(f)(3) did not apply). Even if *Wooden* newly recognized a right, that right is not applicable to Swan, and Swan cannot rely on § 2255(f)(3) to justify filing his claim more than one year after his conviction became final.

**D.** **Wooden is inapplicable to Swan's case, and his distribution of cocaine in two separate instances, weeks apart, are convictions committed on different occasions under the ACCA.**

Even if the Court were to reach the merits of Swan's newly raised argument, *Wooden* does not entitle him to relief. The record demonstrates that his three prior drug convictions were all committed on separate occasions. In particular, the two federal drug distribution offenses that Swan claims were double counted were committed 20 days apart. This time gap alone is enough to establish that these drug transactions were not part of an "uninterrupted course of conduct." *Wooden*, 142 S. Ct. at 1071. Indeed, while *Wooden* explained that the separate occasions analysis is "multi-factored," it made clear that a "single factor" like time or place, "can decisively differentiate occasions." *Id*. at 1071. Contrary to Swan's arguments, that he twice sold cocaine to the same informant does not compel a different outcome under *Wooden*. *See id*. Nor does the fact that Swan was charged and sentenced for both offenses in the same case have any bearing on whether he committed the offenses on different occasions. *United States v. Van*, 543 F.3d 963, 966 (8th Cir. 2008). As such, *Wooden* left undisturbed the Court's finding that Swan is an armed career criminal and provides no basis for relief here.

Swan's reliance on *Lewis v. United States*, 142 S. Ct. 1439 (2022) is misplaced. In his Supplement, Swan argues that the "facts in Lewis, and the use of enhanced penalties via the ACCA, directly correspond to the facts of my case and the use of the ACCA here." Supp. Mot. at 6. First, as Swan recognizes, the Supreme Court in *Lewis* granted certiorari, vacated the judgment, and remanded the case to the Court of Appeals "for further consideration in light of *Wooden*." 142 S. Ct. at 1439. The Supreme Court, in a one-

paragraph memorandum, did not set forth any basis for its decision. *See id*. Such an order, often abbreviated as "GVR," is not a final determination on the merits. See *Kenemore v. Roy*, 690 F.3d 639, 641–42 (5th Cir. 2012) ("When the Supreme Court utilizes its GVR power, however, it is not making a decision that has any determinative impact on future lower-court proceedings."); *Gonzalez v. Justices of Mun. Court of Boston*, 420 F.3d 5, 7 (1st Cir. 2005) ("The GVR order itself does not constitute a final determination on the merits; it does not even carry precedential weight."); *West v. Vaughn*, 204 F.3d 53, 58 (3d Cir. 2000) (citing Supreme Court precedent for fact that GVR orders "require only 'consideration' by the lower court and are not summary reversals"); see also *Tyler v. Cain*, 533 U.S. 656, 666 n.6 (2001). To the extent Swan asks this Court to infer that the Supreme Court passed judgment on the facts in *Lewis*, the Court will refuse to do so.

Second, the argument considered in Lewis was a narrow one. Like Swan, the defendant in Lewis was convicted in one case of multiple counts (in his case, three) of selling cocaine, each pertaining to a separate drug transaction on different dates between four days and two weeks apart. *United States v. Lewis*, 833 F. App'x 261, 263, 267 (11th Cir. 2020). The similarities between *Lewis* and Swan's case begin and end there. The defendant in *Lewis* appealed based on a seemingly novel argument, which the Eleventh Circuit described as so: "that his 1990 conviction should not be treated as three separate offenses for purposes of the ACCA because he pled *nolo contendere* to those charges and because they result from sentencing manipulation." *Id*. at 265–66. In support, the defendant argued that "Florida courts are permitted to vary downward in sentencing defendants if they find 'sentence manipulation,' i.e., when it is shown that law enforcement continued

sting operations against a defendant solely to enhance the defendant's sentence." *Id*. at 266. The court went on to "reject his argument based on sentence manipulation" and upheld the application of the ACCA under Eleventh Circuit precedent. *Id*. at 267. Even if it were binding precedent, the relevance to Swan's case of such a holding being vacated is questionable at best.

In any event, *Lewis* does not entitle Swan to relief. Considering the factors set forth in *Wooden*, Swan was correctly sentenced as an armed career criminal, and *Lewis* is irrelevant to that determination. Indeed, courts to have applied the ACCA post-*Wooden* have continued to hold that multiple convictions for separate offenses committed even just a few days apart constitute multiple predicate offenses under the ACCA. *See, e.g., United States v. Daniels*, No. 21-4171, 2022 WL 1135102, at *1 (4th Cir. Apr. 18, 2022) (five days); *Culbertson v. Gilley*, No. 6:22-cv-110-KKC, 2022 WL 1785616, at *4 (E.D. Ky. June 1, 2022) (five days); *Morris v. Williams*, No. 3:20-cv- 572-NJR, 2022 WL 866140, at *2 n.3 (S.D. Ill. Mar. 23, 2022) (four days); see also *United States v. Barrera*, No. 20-10368, 2022 WL 1239052, at *2 (9th Cir. Apr. 27, 2022) ("Courts . . . have nearly always treated offenses as occurring on separate occasions if a person committed them a day or more apart."); *United States v. Jones*, No. 20-11841, 2022 WL 1763403, at *2 (11th Cir. June 1, 2022) (finding conduct "clearly falls within the reach of the different-occasions provision" here defendant "committed seven offenses on seven different days over a six-month period"); *Anderson v. United States*, No. 4:21-cv-1472-RWS, 2022 WL 1591750 (E.D. Mo. May 19, 2022) (noting assertion that court "should apply the substantive nature of the holding in *Wooden* to this action" where petitioner sold controlled substances on

three separate days in an approximately two weeks period was "without merit"). The Court will similarly hold that Swan's two federal drug offenses, committed 20 days apart, were committed on different occasions under *Wooden*.

## V.  PETITIONER'S SECOND SUPPLEMENT AND COUNSEL'S LETTER

On November 30, 2022, Petitioner Swan filed his Second Supplement to his Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255. *Swan v. United States*, No. 1:21-CV-00142-SNLJ ("Civil Case"), Doc. 29 ("Second Supplement"). In his Second Supplement, Petitioner raised an additional ground for post-conviction relief based on a district court decision, *United States v. Myers*, No. 4:18-CR-00092 (W.D. Mo. Sept. 17, 2021), and the then- pending appeal before the Eighth Circuit, *United States v. Myers*, No. 21-3443 (8th Cir.) (filed October 29, 2021). In addition, on January 24, 2024, Petitioner's trial counsel filed a letter with the Court in support of the claim in Petitioner's Second Supplement. Civil Case, Doc. 30 ("Letter"). Because Petitioner's claim is untimely and does not provide a basis for relief, the Court rejects his Second Supplement and denies Petitioner's Motion to Vacate, Set Aside, or Correct Sentence without a hearing.

### A. Analysis

Swan argues that his defense counsel provided ineffective assistance at his 2019 sentencing for not challenging the designation of his Missouri distribution of cocaine conviction as an ACCA-predicate based on the almost-two-years-later decision in *Myers*. This claim is both time-barred and incorrect. Because the argument made in *Myers* would have been novel under Eighth Circuit law at the time of Swan's sentencing, counsel's lack of objection on this basis was in no way ineffective. Accordingly, the Court will reject this

new and untimely argument and deny his Motion to Vacate.

1. **Swan's additional argument challenging his designation as an armed career criminal is untimely under the statute of limitations set forth in § 2255(f) and is therefore non-cognizable.**

As an initial matter, the Court will refuse to consider the merits of Swan's new ACCA-based claim because it is time-barred. A one-year time limit applies to a motion under § 2255, starting from the latest of, relevant here, the following: "(1) the date on which the judgment of conviction becomes final; . . . [or] (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." 28 U.S.C. § 2255(f). Swan has already attempted to raise an untimely challenge to his designation as an armed career criminal in his First Supplement. For the same reasons as those set forth in the United States' response to Swan's First Supplement, the one-year statute of limitations bars Swan from doing so. *See* Civil Case, Doc. 18 at 6–10.

First, Swan's new claim regarding the ACCA is untimely under § 2255(f)(1) because it was raised for the first time in a motion on August 22, 2022, more than one year after his judgment of conviction became final on February 27, 2021. Under § 2255(f)(1), Swan was required file a § 2255 motion no later than February 27, 2022. *See Mora-Higuera v. United States*, 914 F.3d 1152, 1154 (8th Cir. 2019). Though Swan's original Motion to Vacate was filed before this deadline, his new argument regarding the ACCA does not "relate back" to any the claims raised in this original Motion and thus are untimely. *See Taylor v. United States*, 792 F.3d 865, 869–71 (8th Cir. 2015) (making clear that a motion to amend filed after the one-year statute of limitations is considered timely only if the

amended claims "relate back" to those previously raised timely claims"). Swan's Motion did not make any arguments regarding the Court's application of the ACCA to his case or, for that matter, any claims relating to his sentencing whatsoever. Indeed, Swan's new claim, like that raised in his First Supplement, rests on a different set of facts, namely his criminal history and sentencing as an armed career criminal, than the facts underlying his original Motion to Vacate, and thus it does not "relate back" to the date his original motion was filed. *See id.* at 869 ("New claims must arise out of the 'same set of facts' as the original claims, and '[t]he facts alleged must be specific enough to put the opposing party on notice of the factual basis for the claim.'"). Accordingly, his new claim is out-of-time and barred under § 2255(f)(1).

Section 2255(f)(3) also does not save Swan's failure to comply with the one-year statute of limitations. Under that section, the one-year statute of limitation may restart from the date of a Supreme Court decision recognizing a new right made retroactive to cases on collateral review. That circumstance does not exist here. To date, the Supreme Court has not addressed the issues considered by the Eighth Circuit in *Myers*. See *Jones v. United States*, No. 4:23-CV-001083-CDP, 2023 WL 6141682, at *2 (E.D. Mo. Sept. 20, 2023) (concluding that *Myers* does not restart the one-year statute of limitations under § 2255(f)(3)). As such, the Court will not consider the merits of Swan's untimely claim. *See United States v. Craycraft*, 167 F.3d 451, 457 (8th Cir. 1999) (finding that district court was precluded from considering time-barred claim).

> **2. Counsel did not provide ineffective assistance at sentencing by not objecting to Swan's armed-career-criminal designation based on a novel argument unsupported by Eighth Circuit law.**

Even if the Court were to entertain the merits of Swan's second challenge to his ACCA-designation, Swan fails to meet the "high bar" to establish that counsel was constitutionally ineffective. *See, e.g., United States v. Love*, 949 F.3d 406, 410 (8th Cir. 2020). Under *Strickland v. Washington*, 466 U.S. 668 (1984), Swan bears the burden of demonstrating both that "counsel's performance was so deficient as to fall below an objective standard of reasonable competence, and that the deficient performance prejudiced his defense." *Nave v. Delo*, 62 F.3d 1024, 1035 (8th Cir. 1995) (quotation omitted) (emphasis added). "If the petitioner makes an insufficient showing on one component, the court need not address both components." *Kingsberry v. United States*, 202 F.3d 1030, 1032 (8th Cir. 2000). Judicial scrutiny of counsel's performance is "highly deferential," and there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *Harrington v. Richter*, 562 U.S. 86, 104 (2011). In evaluating counsel's conduct, the court should avoid "the distorting effects of hindsight," *Strickland*, 466 U.S. at 689, and "try to evaluate counsel's conduct by looking at the circumstances as they must have appeared to counsel at the time." *Rodela-Aguilar v. United States*, 596 F.3d 457, 461 (8th Cir. 2010) (quotation omitted).

Under the ACCA, a serious drug offense includes "an offense under State law, involving … distributing … a controlled substance" as defined under federal law. 18 U.S.C. § 924(e)(2)(A)(ii). Swan alleges ineffective assistance by his counsel for not raising a specific objection to application of the ACCA to his Missouri distribution of cocaine conviction, based on *United States v. Myers*, No. 4:18-CR-092 (W.D. Mo. Sept. 17, 2021).

After Swan filed his Second Supplement, the Eighth Circuit decided the appeal of *Myers*. *United States v. Myers*, 56 F.4th 595 (8th Cir. 2022) (decided Dec. 29, 2022). In *Myers*, the Eighth Circuit, adopting the reasoning of the district court, held that the defendant's prior conviction for distribution of cocaine under RSMo § 195.211 (2003)—the same offense for which Swan was previously convicted—was not a serious drug offense and thus could not serve as an ACCA-predicate. Specifically, the Court in *Myers* interpreted Missouri's 2003 definition of cocaine to include positional isomers, which the federal drug schedule did not criminalize, meaning the Missouri definition of cocaine was broader and consequently the defendant's conviction did not qualify as a serious drug offense for purposes of the ACCA. 56 F.4th at 598–99. Though, at sentencing, counsel did raise a different objection to treatment of Swan's Missouri distribution of cocaine conviction as a serious drug offense, Swan claims effective counsel would have instead objected on the same basis as in *Myers*.

However, the Eighth Circuit has long made clear that "counsel is not accountable for unknown future changes in the law." *Toledo v. United States*, 581 F.3d 678, 681 (8th Cir. 2009) (citing *Horne v. Trickey*, 895 F.2d 497, 500 (8th Cir. 1990) (not ineffective assistance of counsel to fail to foresee "a significant change in existing law."); *Parker v. Bowersox*, 188 F.3d 923, 929 (8th Cir. 1999) (not ineffective assistance of counsel to "fail[] to anticipate a change in the law")); *see also Hamberg v. United States*, 675 F.3d 1170, 1173 (8th Cir. 2012) (counsel not ineffective for failing to object to correct application of settled law within circuit); *Fields v. United States*, 201 F.3d 1025, 1027 (8th Cir. 2000) (counsel not ineffective for failing to raise claim on issue where there is split of authority

among circuits, but no Eighth Circuit or Supreme Court law on subject). Accordingly, the Eighth Circuit has consistently rejected claims of ineffective assistance of counsel that, like Swan's, are premised on counsel not advancing an argument based on a case decided after a petitioner's has concluded. *See Toledo*, 581 F.3d at 681 (counsel not ineffective for failing to object to designation of prior conviction as ACCA-predicate under then-existing law, even if Supreme Court later held it did not qualify); *Brown v. United States*, 311 F.3d 875, 878 (8th Cir. 2002) (counsel not ineffective for failing to make "*Apprendi*-type" argument prior to *Apprendi*); *Wadja v. United States*, 64 F.3d 385, 388 (8th Cir. 1995) ("Counsel could not be expected to make a *Johnson*-type of argument before *Johnson* was decided; counsel's performance is not deficient by failing to predict future developments in the law.").

Applied here, under then-existing Eighth Circuit precedent at the time of his sentencing, Swan's distribution of a controlled substance conviction qualified as a serious drug offense. As this Court recognized in 2018, a year before Swan's sentencing, "[t]he Eighth Circuit has consistently held that a conviction for violating Mo. Rev. Stat. § 195.211 qualifies as an ACCA predicate 'serious drug offense.'" *Johnson v. United States*, No. 1:17-CV-00097-SNLJ, 2018 WL 4616458, at *8 (E.D. Mo. Sept. 26, 2018) (citing cases). Just two months before Swan's sentencing, the Eighth Circuit rejected an appeal challenging whether a Missouri distribution of cocaine conviction qualified as a serious drug offense. *United States v. Jones*, 934 F.3d 842 (8th Cir. 2019). In finding that a violation of Mo. Rev. Stat. § 195.211 by distributing cocaine did constitute a serious drug offense, the Eighth Circuit concluded that cocaine base was a "substance that qualified as a

'controlled substance' under both state and federal law" and, as a result, "the state offenses match the federal definition." *Id*. at 843. In fact, between Swan's sentencing and *Myers*, the Eighth Circuit twice reaffirmed that Missouri convictions for distribution of cocaine were qualifying offenses under the ACCA, presuming that the Missouri and federal definitions of cocaine were the same. *See United States v. Jones*, 810 F. App'x 488, 489 (8th Cir. 2020); United States v. Young, 6 F.4th 804, 810 (8th Cir. 2021). Thus, a *Myers*-type objection that the Missouri definition of cocaine was broader than the federal one would have run contrary to binding Eighth Circuit precedent when Swan was sentenced, and counsel's performance was not deficient for failing to make this argument two years before the Eighth Circuit decided *Myers*. *See Toledo*, 581 F.3d at 681; *see also Rodriguez v. United States*, 17 F.3d 225, 226 (8th Cir. 1994) ("Counsel's failure to advance a meritless argument cannot constitute ineffective assistance.").

Myers represented a change in the law, and a similar argument would have been wholly novel at the time of Swan's sentencing. *See Anderson v. United States*, 393 F.3d 749, 754 (8th Cir. 2005). In arguing to the contrary, Swan asserts in his Second Supplement, as does counsel in her Letter, that the Supreme Court's decision in *Mathis* dictated that counsel make the same isomer-based challenge to Missouri's definition of cocaine as in *Myers*. *Mathis* did no such thing. *Mathis* merely reiterated the modified categorical approach that courts use to compare the elements of a state offense like Missouri's distribution of a controlled substance with the definition of serious drug offense under the ACCA. In fact, the Eighth Circuit in *Jones*, in determining that distributing cocaine under Missouri law was a serious drug offense, indicated that it "appl[ied] a modified categorical

64

approach" and cited to *Mathis*. See *Jones*, 934 F.3d at 842–43. The *Jones* decision underscores that the isomer-based argument made in *Myers* was not an obvious or required result after *Mathis*. Instead, as described above, the Eighth Circuit post-*Mathis* repeatedly confirmed that Missouri's definition of cocaine was the same as the federal definition, and, consequently, *Mathis* does not support Swan's ineffective assistance of counsel argument.

Nor does Swan's comparison to *United States v. Wade*, No. 1:20-CV-00272-SNLJ (E.D. Mo.) support his argument. In *Wade*, petitioner alleged ineffective assistance of counsel for failing to object to his Missouri marijuana conviction as an ACCA predicate based on a Ninth Circuit case decided two years after the petitioner's sentencing. But this Court rejected that claim, finding that this objection would have been "wholly novel" at the time of petitioner's sentencing. *See Wade*, No. 1:20-CV-00272-SNLJ, Doc. 9 at 13. The same reasoning applies here, and the Court should similarly reject Swan's claimed ineffective assistance at his sentencing based on an Eighth Circuit decision that was over two years away from being decided.

## V.    NEED FOR EVIDENTIARY HEARING AND BURDEN OF PROOF

A motion filed under 28 U.S.C. § 2255 should be denied without an evidentiary hearing when the court records conclusively show that the movant is not entitled to relief. The statute provides, in pertinent part:

> Unless the motion and the files and records of the case conclusively show that the prisoner is not entitled to relief, the court shall . . . grant a prompt hearing thereon.

*Id*. Additionally, Rule 4(b) of the Rules Governing Section 2255 Proceedings for the United States District Court states:

The motion, together with all the files, records, transcripts, and correspondence relating to the judgment under attack, shall be examined promptly by the judge to whom it is assigned. If it plainly appears from the face of the motion and any annexed exhibits in the prior proceedings in the case that the movant is not entitled to relief in the district court, the judge shall make an order for its summary dismissal and cause the movant to be notified.

When a petition is brought under Section 2255, the petitioner bears the burden of establishing the need for an evidentiary hearing. A district court is given discretion in determining whether to hold an evidentiary hearing on a motion under 28 U.S.C. § 2255. *United States v. Oldham*, 787 F.2d 454, 457 (8th Cir. 1986). In exercising that discretion, the district court must determine whether the alleged facts, if true, would entitle the movant to relief. *Payne v. United States*, 78 F.3d 343, 347 (8th Cir. 1996). Moreover, in conducting this inquiry, courts may not give weight to "conclusory allegations, self- interested characterizations, discredited inventions, or opprobrious epithets." *Simmons v. United States*, No. 1:16-CV-00101- SNLJ, 2016 WL 5941929 (E.D. Mo. Oct. 13, 2016) (citation omitted); *see also Ford v. United States*, 917 F.3d 1015, 1026 (8th Cir. 2019) (reaffirming long-standing rule of dismissing allegations that are "contradicted by the record, inherently incredible, or conclusions rather than statements of fact."). A hearing is unnecessary when a Section 2255 motion (1) is inadequate on its face, or (2) although facially adequate, is conclusively refuted as to the alleged facts by the files and the records of the case. *Id*. at 225-26; *see also United States v. Robinson*, 64 F.3d 403 (8th Cir. 1995); *Engehlen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995).

## VI.    MOTION TO AMEND/SUPPLEMENT 28 U.S.C. § 2255 PETITION

On May 12, 2023, Swan filed a Motion to Amend/Supplement 28 U.S.C. § 2255

66

Petition.  Section §2255 (f) provides that:

> "A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of—
>
>> (1) the date on which the judgment of conviction becomes final;
>>
>> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>>
>> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>>
>> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence."

The judgment of conviction became final on February 2, 2022, when Swan's 90-day deadline for filing a petition for writ of certiorari expired.  Swan filed the pending Motion to Amend/Supplement 28 U.S.C. §2255 Petition on May 12, 2023. Accordingly, his motion to vacate is not timely under the general one-year limitation period in section 2255(f)(1).  *See Mora-Higuera v. United States*, 914 F.3d 1152, 1154 (8th Cir. 2019) (per curiam) ("Motions under § 2255 are subject to a one-year limitations period.  In practice, this usually means that a prisoner must file a motion within one year of 'the date on which the judgment of conviction becomes final.'").  Therefore, the Court will deny Swan's Motion to Amend/Supplement 28 U.S.C. §2255 Petition [Doc. 22].

## VII.  <u>CONCLUSION</u>

For the foregoing reasons, this Court will deny Swan's § 2255 motion [Doc. 1] without an evidentiary hearing.

**IT IS FURTHER ORDERED** this Court will not issue a certificate of appealability because Swan has not made a substantial showing of the denial of federal constitutional right.

**SO ORDERED** this 28th day of June, 2024.

_____

STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE